FORT SMITH LUMBER COMPANY *v.* SHACKLEFORD.

## Opinion delivered November 16, 1914:

1. SERVICE OF PROCESS—CORPORATIONS—PLACE OF BUSINESS.—The words "branch office" and "other place of business" as used in § 1, p. 293, Act 98, Acts 1909, covering the matter of service of process on domestic and foreign corporations, *held*, not to be synonymous.

2. SERVICE OF PROCESS—CORPORATIONS.—Under Act 98, Acts 1909, service of process may be had upon any corporation wherever it maintains a place of business whether it had it or did not have an office at that place, and service may be had upon the corporation by service upon the employee in charge of the business at that place.

3. SERVICE OF PROCESS—CORPORATIONS—"BRANCH OFFICE."—The term "branch office" as used in Act 98, § 1, Acts 1909, designates a place maintained by a corporation in the county where business is transacted similar to that where the principal office is situated.

4. SERVICE OF PROCESS—CORPORATIONS—AGENT.—Service of process upon a corporation under Act 98, p. 293, Acts 1909, provides that service may be had upon the agent of a corporation, where a well defined line of business is carried on, with an agent in charge of that business.

5. SERVICE OF PROCESS—CORPORATIONS—PLACE OF BUSINESS.—A corporation will be held to be maintaining a place of business within a county, under § 1, Act 98, p. 293, Acts 1909,. where it was engaged in the sale of general merchandise in connection with its logging business.

6. SERVICE OF PROCESS—CORPORATIONS.—Service of process upon the agent of a corporation in charge of a general merchandise store run in connection with the corporation's logging business, *held*, valid under Act 98, Acts 1909.

7. MASTER AND SERVANT—RELATIONSHIP—EXISTS WHEN.—When the testimony showed that plaintiff was employed by one supposed to be defendant's manager, and paid with defendant's checks, it will be held that the evidence warranted a finding that plaintiff was in defendant's employ.

8. MASTER AND SERVANT—INJURY TO SERVANT—QUESTION OF FACT.— Plaintiff was injured while working as brakeman of a logging train, by reason of the train's backing after a signal to stop. *Held*, under the evidence, the issues of negligence and contributory negligence were questions of fact for the jury.

9. MASTER AND SERVANT — EMPLOYMENT — EVIDENCE — CONTRADICTORY STATEMENTS.—In an action for damages for personal injuries by a servant against the master, when one of the issues was as to

whether the plaintiff was employed by defendant, testimony is admissible to contradict a statement of the defendant's manager that defendant was not operating the logging road upon which plaintiff was injured.

10. EVIDENCE—CROSS EXAMINATION—CREDIBILITY OF WITNESS.—In an action for damages for personal injuries, the issue was raised as to the ownership of a certain logging road. The manager of defendant testified that defendant purchased the rails and engines in 1913. *Held*, it was competent on cross examination to ask the witness why defendant assessed the same values in rails and engines in 1912 as in 1913, on the issue of showing whose property the rails and engines were, and as testing the credibility of the witness.

11. EVIDENCE—CROSS EXAMINATION—PREJUDICE.—On the issue of plaintiff's employment by defendant in an action for damages for personal injuries, it is not prejudicial error to permit defendant's manager to be asked on cross examination if in another suit he did not file an answer admitting plaintiff to be in defendant's employ, to which question he replied that attorneys had prepared the answer, and that he did not remember what was in it, and when no attempt was made to contradict witness's testimony by exhibiting the answer filed in the former suit.

12. APPEAL AND ERROR—INSTRUCTIONS—DUPLICATING INSTRUCTIONS.—It is not error for the court to refuse to give an instruction covered by a correct instruction already given.

13. MASTER AND SERVANT—RULES—NOTICE TO SERVANT.—It is the duty of a master to make rules for the protection of its employees, and to make these rules known to the employees, but there is no affirmative duty devolving upon the employee to ascertain what the master's rules are.

14. WITNESSES—CREDIBILITY.—It is not error, when defendant requested an instruction on the issue of credibility that the jury "apply to the plaintiff as well as to each of the other witnesses" the rules concerning credibility for the court to change the wording to "shall apply to each and all the witnesses."

15. TRIAL—ARGUMENT OF COUNSEL—PREJUDICE.—The prejudice resulting from improper argument of counsel, may be cured by proper admonitions from the court and a disclaimer by counsel of any intention to discuss facts not disclosed in the record.

Appeal from Perry Circuit Court; *Robert J. Lea*, Judge; affirmed.

*J. H. Bowen, H. L. Fitzhugh* and *James B. McDonough*, for appellant.

1. Under the statute appellant could not be sued in Perry County, but only in the county where it is situated and has its principal office or place of business. Kirby's Dig., § 6067. Act 98 of the Acts of 1909, p. 293, does not change the rule. The facts show that appellant does not keep or have in Perry County a branch office or other place of business within the meaning of that act. The principal office and place of business is at Plainview, in Yell County. The words "other place of business" refer to a place of business like an office or similar to an office. A movable logging camp and a movable commissary do not constitute an office or other place of business such as is contemplated by the act, but its clear meaning is that the office or place of business must be of such nature as will authorize the service of a summons.

It is not every agent or employee of a corporation upon whom service may be had. 62 Ark. 144; 32 Ark. 17; 40 Ark. 141; 59 Ark. 583; *Id.* 593.

2. The court erred in admitting testimony tending to show that appellant shipped two car loads of lumber or logs to J. Q. Allen. It was not material and was inadmissible. 32 Cyc. 466.

3. The court erred in not directing a verdict in favor of appellant. The evidence clearly shows that appellee, at the time he was injured, was in the employ of the Central Railway Company of Arkansas, and not in the employ of the appellant. The court should have directed a verdict for appellant for the further reason that no negligence is shown on the part of the engineer.

4. The evidence as to the assessment of appellant's property was clearly incompetent.

Since it is well settled that assessment lists are inadmissible to show the value of property, they are also inadmissible to show who operated that property. The admission of the assessment lists was prejudicial and clearly erroneous. 42 Ark. 527; 44 Ark. 258.

5. The court erred in permitting plaintiff's counsel to ask the witness, C. W. Jones, questions concerning the

nature of a suit brought in Yell County against the Central Railway Company and this appellant, and concerning the answer filed therein. It was not shown that he had any knowledge or information of the nature of the answer that was filed by the railway company. The testimony was incompetent. 21 Ark. 329; 33 Ark. 251; 58 Ark. 490; 34 Ark. 720; 14 Ark. 640; 15 Ark. 280; 17 Ark. 60.

*Jones & Owens* and *Frank Pace,* for appellee.

WOOD, J. Plaintiff filed a complaint against the Fort Smith Lumber Company and the Central Railway Company of Arkansas in the Perry Circuit Court. Summons was issued and alleged to have been served upon each of the defendants in Perry County. The defendants appeared specially and moved to suppress the service. The court sustained the motion as to the Central Railway Company, but overruled same as to the Fort Smith Lumber Company. The Fort Smith Lumber Company, appellant here, excepted to the ruling of the court and reserved the issue as to the service in its answer. The cause was tried before a jury and the verdict and judgment were in favor of the appellee in the sum of $12,000, and this appeal has been duly prosecuted.

*First.* The appellant contends that there was no service. The return of the officer is as follows: "I have this 8th day of January, 1914, duly served the within upon the Fort Smith Lumber Company by delivering a copy of same to L. G. Elliott in Perry County, Arkansas, agent of the Fort Smith Lumber Company, and in charge of its office and store and place of business in Perry County, Arkansas."

L. G. Elliott testified that he had been in charge of a commissary for the appellant since July, 1913, selling goods for the appellant. The goods were bought from the main office upon requisition from witness. He got a merchandise car once a week. The commissary was situated in two movable box cars, each about 50 feet long. The cars were on a siding. Witness was clerk or sales-

man for the appellant. He had no office. Witness had been in the employ of the company since August, 1912, and they were running the commissary at that time. Before witness took charge of the commissary he was the timekeeper, and his office as timekeeper was in the commissary. Appellant built an addition to the commissary which is the office of the timekeeper; it is built onto the commissary cars. Appellant kept a general line of goods in the commissary that would invoice on an average about $4,000. Witness made daily reports to the general office or headquarters at Plainview, in Yell County, of the amount of business done. Witness reported to the timekeeper; turned over his cash and coupons to the timekeeper at night, and the timekeeper sent in the reports to the general office. The only report witness made in person to the company was a requisition for goods. As the company proceeded with its logging road into the forest it followed it up with its camps and commissary. Witness had shipped out some cars of lumber for one J. Q. Allen, charging him $10 per car. The money was received for the appellant. There were some oak logs shipped out in the latter part of the winter of 1913. Witness was told from the Plainview office to collect the charges for the shipment. He did so and entered it up on the books in favor of the Fort Smith Lumber Company. Witness reported this transaction, in connection with the commissary, to the appellant company. Witness was promoted from timekeeper to manager of the store. Witness had general charge of the store. The timekeeper keeps the books. When witness was promoted to manager the timekeeper became his bookkeeper, that is, he was the bookkeeper for the store or commissary, but was employed by the appellant. He reported to the Plainview office what witness reported to him to send to the company. Witness further stated that in case the timekeeper was not there he issued coupon books and attended to the business for him. Witness usually did all the clerking himself in the store, but sometimes the timekeeper would wait on customers.

Witness did not sign the reports that he made to the timekeeper to be sent to the company. These were signed by the timekeeper himself. Witness at one time had another party working for him in the store. Witness was responsible to the company for the management of the store. He was responsible to the company for the cash that he collected for goods sold until he turned it over to the timekeeper. The office that was built for the timekeeper was fastened to the commissary cars in such a way that it would have to be torn down before the cars could be moved. Witness' name appeared on the coupon books that were issued by him. The time keeper's name appeared on the coupon books issued by him. The clerk that was at work for witness in the commissary was sent out from the office at Plainview.

It was shown that appellant had only one logging camp in Perry County, the one at Aplin. It consisted of something like seventy or eighty portable houses. The man in charge of the logging department had control over the employees of that department. The payroll of the camp at Aplin was about $200 a week. Those in the logging department made their reports to the timekeeper and he sent these reports in to the main office.

Act 98 of the Acts of 1909, p. 293, provides as follows:

"Section 1. That from and after the passage of this act, any and all foreign and domestic corporations who keep or maintain in any of the counties of this State a branch office or other place of business shall be subject to suits in any of said counties where said corporation so keeps or maintains such office or place of business, and service * * * upon the agent, servant or employee in charge of said office or place of business shall be deemed good and sufficient service upon corporations and shall be sufficient to give jurisdiction to any of the courts of this State held in the counties where said service of summons is had," etc.

Section 2 provides that the service provided for in the act would not repeal any other statute regulating

service upon corporations in the State, but should be construed as cumulative and "in aid of the laws of the State now in force."

Prior to the passage of the act of 1909, service could be had upon a domestic corporation, like appellant, in the county where it was situated, or where it had its principal office or place of business (where these were separate from the county in which the corporation was situated), or in the county where its chief officer resided. The act of 1909 provides an additional and cumulative method of service "in aid of" the above method.

Considering the acts *in pari materia,* it is clear that the intention of the Legislature was to simplify the proceedings and to facilitate, in the most practical way, the obtaining of service on corporations.

(1-2)   The words "branch office" and "other place of business" are not synonymous, as contended by the learned counsel for appellant. The word "other" distinguishes the term "place of business" from the term "branch office," and shows that the Legislature intended that wherever the corporation maintained a "place of business," whether they had or did not also have an office at the same place, that service could be had upon the corporation by service upon the employee in charge of the business at that place.

In *Revere Rubber Co.* v. *Genesee Valley Blue Stone Co.,* 46 N. Y. Sup. 989, it is said: "The term 'office of a corporation' means its principal office within the State or principal place of business within the State, if it has no principal office therein."

(3)   The word "branch" qualifying the word "office" in the statute under consideration, indicates that the office maintained was to be tributary to the principal office. See Webster's Dictionary, *Branch.* So, in the sense of the statute, the term "branch office" is used to designate a place maintained in the county where business is transacted similar to that where the principal office is situated.

(4-5)   The term "other place of business" refers
to a place where the corporation is conducting a settled
or established business.  The term "branch office" refers
to a place where the company may conduct its general
business in the same way that it carries on its business
at its principal office.  But the term "other place of busi-
ness" designates a place where an established business
of the company is carried on regardless of whether the
company has its principal or branch office situated there
or not.  The agent, servant or employee in charge of a
branch office, under the statute, must be one having au-
thority to carry on the general business of the company.
But not so as to the agent, servant or employee in charge
of the "other place of business."  His authority may be
only limited and special and confined to the particular
business over which he has supervision.  To be sure, the
statute contemplates that there must be maintained a
place where a well defined line of business is carried on
with an agent in charge of that business.  Elliott was
such an agent.  He had charge of the business where the
company maintained a place for conducting its commis-
sary or store business.  It was a settled business so long
as the company should be engaged in logging at Aplin,
in Perry County.  The number of houses maintained at
the company's camp, the number of employees, the
amount of its payroll, the extent of the stock of goods
kept in its commissary, and the timekeeper's office in
connection therewith all indicate that the company was
maintaining a place of business from which it was con-
ducting a well defined line of business, towit, the sale
of general merchandise, in connection also with its log-
ging business.  Elliott was the manager of this mercan-
tile business.  An agent competent to conduct such a
business could be depended upon with reasonable cer-
tainty to apprise the corporation of the service had upon
him.  It was the design of the Legislature that service
could be had upon an agent of this character, and that
when so obtained it should constitute service upon the
corporation itself.

(6)   The court, therefore, did not err in overruling appellant's motion to suppress the service.

*Second.*  The complaint alleged that the appellee was in the employ of the appellant as brakeman on the 4th of September, 1912; that while engaged in the discharge of his duty as brakeman it was necessary for him to go between the standing cars and to use his foot to properly place the drawbars; that while thus engaged "the engineer on said train carelessly and negligently, without any warning whatsoever, backed its engine and cars down upon plaintiff, crushing his leg," etc.  The appellant denied that the appellee was in the employ of appellant, and denied the allegations of negligence, and set up the defense of assumed risk and contributory negligence.

Appellant contends that the court erred in not directing a verdict in its favor, for two reasons:

1.   Because the evidence did not show that appellee was in the employ of the appellant at the time of his injury; and,

2.   That there was no proof of negligence.

(a) (7)   The appellee testified that he was in the employ of the Fort Smith Lumber Company on the 4th day of September, 1912, the day he was injured, working as a brakeman; that he was employed by one Covington, who was supposed to be the manager of the woods department of the appellant, in Perry County.  Appellant paid him twice a month for his services.  The checks on on which he drew the cash at the store were signed for the appellant.  Appellee never received checks from the Central Railway Company.

The testimony of another witness also was to the effect that appellant "paid the men that operated the train over that road."

The above testimony was sufficient to warrant a finding that appellee was in the employ of appellant.

(b)   The testimony tended to show that the train crew was making up a train of logs and while engaged in doing this it became necessary to couple a car onto

the train. It was appellee's duty to make this coupling. One Cooper was engineer. Appellee testified, so far as it is necessary to set it out, on this issue, as follows: "Cooper approached something like right there about the same time I was. I was flagging him down. He stopped eight or ten feet from the car. I saw the drawbar would not couple like they should, is the reason I flagged him down. He stopped. I don't know whether he saw me or not, but I know he stopped. There is a loose motion in the drawbars. One opens this way and the other that way. You have got to get them both in line before you can couple them. I grabbed the grab iron on the side of this car. He could see me all the time if he had been looking. I never went between the cars because there were logs sticking out over the car and I had to either walk around that log or crawl under it and lift this drawbar. It was just as easy or convenient. There was not any danger to do it. That is the way I always look at it. If the train was standing still I put my foot up there and push it over. I had hold of this grab iron and pushed this drawbar over with my foot. It sprung back and I pushed it over again. The engine came back. The logs came together before the knuckles did, and tilted the car sideways and the logs clipped back and came together enough to press my foot. It was the duty of the engineer to hold the train until he got a signal from me to move it back. I gave the engineer a stop signal only, gave him a back-up signal and after that I flagged him down and he stopped. I didn't give him any signal between that time and the time I got hurt."

Appellee further testified, in response to questions, that he gave the engineer a stop signal, and that in response to that signal the engineer stopped the train; that up to the time appellee was hurt he had not given the engineer any signal to back up.

There was other testimony to the effect that the engineer stopped the train.

The engineer testified to the effect that no signal was given him and that he did not stop the train from

the time it left the switch until it coupled onto the car
where appellee was injured; that he was going very slow.
He was looking back towards the appellee and saw him
all the time until the car struck. He did not stop the cars
before they struck, and got no signal from appellee to
stop. If he did he didn't see it. He further testified that
it was the duty of the appellee, under the rules of the
company, when it becomes necessary to line up the draw-
bars, to flag down the train and cause it to come to a
stop. He states that he was looking at the appellee un-
til the cars bumped together, and that appellee was mo-
tioning him all the time, and that he was backing up in
response to the signal of the appellee, but that the ap-
pellee did not signal him to stop at all.

The engineer was corroborated by Doctor Ballinger,
who was on the engine at the time of the injury, to the
effect that the engineer did not receive any signal from
the appellee to stop the train and that he did not stop
the train before the cars came together. Another wit-
ness also testified that the train did not stop.

On the other hand, the fireman, who was on the en-
gine at the time, corroborated the testimony of the ap-
pellee, to the effect that the train came to a stop. The
fireman did not see the appellee give the engineer the
signal to stop, but was positive in his testimony that the
train did stop.

(8)    Under the above testimony, the issues of negli-
gence and contributory negligence were for the jury.
There was a rule of the company to the effect that in
coupling cars employees could not use their feet to push
drawheads in line, but it would be a question for the jury
as to whether an employee would be guilty of contribu-
tory negligence where he had caused the engine to come
to a full stop before undertaking to align the drawheads
with his foot. The jury might have found from the above
testimony that the appellee, before he undertook to ad-
just the drawheads with his foot, signalled the engineer
to stop the train; that the engineer, in obedience to this
signal, did stop the train, and that the engineer saw the

appellee go between the cars, and that he caused the train to start and back up upon the appellee before he had received any signal to do so after bringing his engine to a full stop.

The issues as to negligence and contributory negligence were, therefore, issues of fact and not of law.

*Third.* On the issue as to whether or not appellee was in the employ of the appellant at the time he was injured, one C. W. Jones testified that he was the secretary and general manager of the appellant at that time, and that appellee, on the 4th day of September, 1912, (the date of the injury) was in the employ of the Central Railway Company; that such company was operating the trains over the road of the Fort Smith Lumber Company. The witness was asked whether or not he had, during the years 1912 and 1913, shipped stuff over his logging road for one John Q. Allen, and answered in the affirmative. He was asked this question: "Q. Didn't you, in making an explanation to him as to why you charged him $10 a car, tell him that you had to do it because that road was being operated by the Fort Smith Lumber Company and for that reason you had to charge him $10 a car?" and answered, "No."

In rebuttal, the appellee, over the objection of the appellant, asked witness John Q. Allen whether or not, during the years 1910, 1911, 1912 and 1913, he had shipped out stuff over the road of the Fort Smith Lumber Company. He answered, "Yes, I shipped lumber and staves and logs over their road." The record then shows the following: "Q. I will ask you if Mr. Jones told you, in making you a rate from the place where you loaded your stuff, that the logging road was being operated by the Fort Smith Lumber Company, and for that reason he would have to charge you $10 a car? A. The first hauling he did for me was from Nimrod, about six miles from where it is now. My recollection is he charged me $7.50 a car from there; then I paid the rate over the Central of Arkansas extra. Q. Did he, in connection with that, tell you that this road was being operated by

the Fort Smith Lumber Company? A. Yes, I asked him what made him make two rates; he said one of them belonged to the Fort Smith Lumber Company and one belonged to the other. Q. That was the logging road, and then the Central Railway Company of Arkansas upon the other road? A. Yes, he said it was two roads."

(9) This testimony was competent. It tended to impeach the testimony of the witness Jones by showing that he had made contradictory statements, and by showing that he had made admissions which tended to prove that at the time appellee received his injury he was in the employ of the appellant instead of the Central Railway Company, which admissions were in direct conflict with the testimony of Jones, given at the trial.

*Fourth.* The witness, Jones, having testified on behalf of appellant that at the time of appellee's injury the engines and track were operated by the Central Railway Company and that the sale of these was not made to the appellant until January or February, 1913, was asked, on cross examination, what the appellant acquired from the Central Railway Company when appellant bought, and answered that the appellant bought the rails and locomotives. Witness was then asked what appellant gave for the rails, and testified, "probably twenty or twenty-five thousand dollars." Witness was then asked how much appellant gave for the engines, and answered: "Between twelve and fifteen thousand dollars;" that the appellant paid the Central Railway Company about $40,000 for the rails and engines it purchased from it in February, 1913.

Witness then testified, in answer to questions, that he assessed the property of appellant for the years 1912 and 1913. He was then handed assessment lists for 1912 and 1913, and, over the objection of appellant, was allowed to read the same. The assessment of appellant's tram road for the year 1912 totalled the sum of $31,725. The assessment of appellant's property, as shown by the list for 1913, which witness testified included the engines and steel, was $33,510. Witness was then asked

the following question: "Will you explain to the jury why, in 1912, when this sale had not been made, you have an assessment there of $31,725, and in 1913 you claim they bought the steel that was worth $25,000, and the engines worth $15,000, making about $40,000, and your assessment for 1913 is only $2,000 more than it was for the year 1912?" Upon objection being made, the court announced that the testimony was only competent for the purpose of tending to show whose property it was at the time of the injury, and that he would admit the testimony with that explanation. The question was then repeated to the witness, and he stated that in 1912 the assessment was turned in to the Tax Commission for the engines and rails, and that the amount was turned in as the assessment for all of it; that he did not remember the exact valuation.

The question was again repeated, and the witness was asked if he had any further explanation to offer, and answered, "Nothing further."

(10) The testimony was responsive to the examination in chief and the questions were legitimate cross examination, and the testimony adduced was competent and proper and should have gone to the jury for what it was worth as pertinent to the issue of who owned and operated the engines and cars at the time appellee was injured. The court expressly told the jury that the testimony was admitted only for the purpose of throwing light on that issue. The testimony was proper to be considered by the jury in determining the credibility of the witness, Jones, taking into consideration the whole of his testimony.

*Fifth.* The appellee, over the objection of appellant, endeavored to show by the witness, Jones, that, when a suit was pending in Yell County by the appellee against the appellant and the Central Railway Company jointly, he, as the secretary and manager of both companies, filed an answer for them in which he admitted that appellee was in the employ of appellant, and denied that he was in the employ of the Central Railway Com-

pany. The witness stated that the answer that was filed was filed by the attorneys. He stated that he did not remember what was in the answer; that there was an answer filed, but that he did not remember about the answer being as counsel for appellee stated.

(11) No prejudice resulted to appellant from the examination of this witness. The witness nowhere admitted that he filed or was responsible for the allegations of the answer in the former suit pending in Yell County, and he stated that he did not remember that the answer that was filed was as stated by the attorney for appellee. After this examination of the witness, no attempt was made by the appellee to controvert the testimony by exhibiting the answer filed in the former suit. Therefore, no possible prejudice could have resulted to appellant from this endeavor on the part of counsel for the appellee to impeach the witness.

*Sixth.* The instructions given at the instance of the appellee and the appellant fully and correctly covered the issues of negligence, contributory negligence and assumed risk. These instructions followed closely the principles of law governing such cases as they have been repeatedly announced by this court. No useful purpose, therefore, could be subserved by considering them in detail, and to do so would unnecessarily lengthen this opinion.

(12) Such of the rejected prayers of the appellant as were correct, the court fully covered by the instructions which it gave both at the instance of the appellant and the appellee. For instance, appellant insists that the court erred in refusing its prayer No. 5, in which the appellant requested the court to tell the jury that, if the plaintiff was guilty of any want of care whereby he unnecessarily exposed himself to danger in attempting to make the coupling he could not recover. This instruction was covered by prayer No. 3, given at appellant's request, which told the jury that if the plaintiff was guilty of negligence contributing to his injury he could not recover; and also in instructions 4 and 6, given at the

instance of the appellee, in which contributory negligence was defined, and the jury were told that the appellee could not recover if he failed to exercise such care as a person of ordinary prudence would have exercised under similar circumstances.

Again, appellant insists that the court erred in refusing its prayer No. 6, as follows:

"If you believe from the evidence that a rule prohibiting brakemen or other employees from using their foot in coupling cars was established, and if you further believe that this rule was known to the plaintiff, or by the exercise of ordinary care on his part could have been known, and if you further believe that plaintiff disregarded this rule and was injured on account thereof, then your verdict should be for the defendant."

The court gave appellant's prayer for instruction No. 7, which is as follows:

"If you believe from the evidence that a rule for the safety of its employees was established preventing such employees from using their feet or foot in coupling cars and that the plaintiff violated same and was injured on account thereof, then the court instructs you that plaintiff was guilty of negligence contributing to his own injury and can not recover."

(13) True, that in appellant's prayer No. 6, the court was asked to express the rule that it was the duty of the appellee to exercise ordinary care on his part to ascertain the rule of the company. This principle is not expressed in instruction No. 7, which the court gave. But it is the duty of the master, as we understand the law, to make rules for the protection of the employees and to make those rules known to the employees. There is no affirmative duty devolving upon the employees to ascertain what the master's rules are. It is the duty of the master to make known to the employees such rules as he has made and published for their protection.

Other portions of the refused prayer No. 6 were fully covered by prayer No. 7, which the court gave.

(14)    Appellant objected to the refusal of the court to grant prayers offered by it relating to the credibility of witnesses, and insists that the court should have told the jury that in considering the weight to be attached to the evidence of each witness the jury should make the rules concerning the credibility of the witnesses "apply to the plaintiff as well as to each of the other witnesses." The court modified the instruction contained in this language so as to make it read, "shall apply to each and all of the witnesses," and gave the instruction as thus modified. The court did not err in refusing the prayer as offered and in making the modification indicated.

The court, in its eighth instruction, given at the instance of the appellee, correctly declared the law by which the jury were to be governed in determining the credibility of witnesses.

*Seventh.* (15)    The alleged error of the court in permitting improper remarks of counsel was fully cured by the instructions of the court not to consider the same, and the remarks of the counsel himself in disclaiming any intention to discuss facts not disclosed in the record.

Upon the whole case the record is free from error, and the judgment must, therefore, be affirmed.