ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY CO. *v.* BOBACK.

Opinion delivered June 13, 1903.

1. RAILROADS—INJURY AT CROSSING—FAILURE TO SIGNAL.—In an action to recover for injuries sustained by a traveler at a railway crossing occasioned by a failure to give the statutory signals, the court properly refused to charge that, in order to recover, plaintiff must show that "the failure of the defendant to ring the bell or sound the whistle at the public crossing caused the horse to take fright and run away;" the question being not whether the horse took fright at the failure to signal, but whether such failure led plaintiff into a more dangerous position than she would otherwise have occupied. (Page 429.)

2. SAME—CONTRIBUTORY NEGLIGENCE.—Where plaintiff, accompanied by her little child, was driving a horse attached to a buggy, and, on approaching a railroad crossing, discovered that a train was approaching, she was not guilty of contributory negligence in jumping from the vehicle and attempting to seize the horse's bridle, to keep him from running away. (Page 430.)

3. TRIAL—WHEN IMPROPER ARGUMENT NOT PREJUDICIAL.—Where the evidence showed that plaintiff had her right clavicle fractured, her shoulder dislocated and three ribs broken, besides serious internal injuries to the womb, bladder and spine, some effects of which might be permanent, a verdict of $1,000 damages is so clearly not excessive that the cause will not be reversed because plaintiff's

counsel used language in his argument calculated to lead the jury to award excessive damages.   (Page 432.)

4.   SAME.—While it is error, in an action for injuries sustained at a railroad crossing, for plaintiff's counsel to state in argument that, if defendants' witnesses had not testified that the statutory signals were given, they would have been discharged, there being no evidence in reference thereto, the case will nevertheless be affirmed if the court is satisfied that no prejudice resulted.   (Page 434.)

5.   NEGLIGENCE—PLEADING AND PROOF.—A ground of negligence proved by the evidence, but not alleged in the complaint nor presented to the jury by the instructions, cannot be relied upon on appeal in support of the judgment below.   (Page 436.)

6.   SAME—CASE STATED.—A verdict for damages against a railroad company is supported by evidence that plaintiff attempted to pass a railroad crossing while a train hidden from view by a hill was rapidly approaching; that plaintiff barely had time to get to the head of her horse in her effort to restrain him when, frightened by the train, he broke and ran away, throwing her down and injuring her; and that, had the statutory signals been given by defendant at such crossing, she could have made better prepara-. tions for the approach of the train, and would  probably have avoided the injury.   (Page 436.)

Appeal from Pope Circuit Court.

Wm. L. Moose, Judge.

Affirmed.

*Dodge & Johnson, Oscar L. Miles,* for appellant.

The crossing was not a public one.   Sand. & H. Dig. § 6196. Liability of railway companies for injury occasioned by frightening of horses.   56 Ark. 387; 60 Ark. 409; Elliot, Railroads, § 1264; 81 Tex. 1; 85 Wis. 570; 74 Wis. 704; 89 Wis. 79; 134 Ind. 16; 98 N. C. 247.   No negligence is shown in the use of the steam engine, cars or railroad.   51 Cal. 605; 14 S. E. 616; 69 Me. 208; 110 Mass. 222; 56 Conn. 44.   Ordinary care is required in the operator of the train.   140 Mass. 79.   Appellee was guilty of contributory negligence.   78 Pa. St. 219; 13 Ind. 87.

*A. S. McKennon,* for appellee.

A traveler in approaching a crossing is required to exercise only ordinary care.   62 Ark. 156; 88 N. Y. 13; 2 Wood, Railways,

1527. Appellee was not guilty of contributory negligence. 12 S. W. 1121.

RIDDICK, J. This is an action brought by Mary Boback against the defendant railway company to recover ten thousand dollars by way of damages for injuries which she claims to have sustained through the negligence of the employees of defendant while they were operating one of its trains. On the day of the accident the plaintiff, accompanied by a little girl only a few years of age, was traveling in a buggy drawn by one horse from her home to the village of Knoxville. The public highway along which she was traveling crossed the railway track between her home and Knoxville. As she got on the track at the crossing, a train, which, on account of a curve and a cut through a hill, could not be seen further than a hundred yards from the crossing, came up and frightened the horse. The horse and buggy passed over the track, and plaintiff, it seems, to prevent the frightened horse from running away jumped out of the buggy, and caught hold of the head of the horse. But she failed to restrain him. He threw her down, and ran away. The wheels of the buggy passed over her, the child was thrown out, and the buggy overturned.

The negligence which plaintiff alleged, and to which she attributes her injuries, was the failure of the employees in charge of the train to give the statutory signals for the approach to the crossing by ringing a bell or sounding a whistle. Plaintiff testified on the trial that before going on the crossing she stopped and looked and listened for trains, but heard none; that when she got on the crossing she saw the train coming; that her horse became frightened, and she did her best to get it off the track, but was so badly frightened she did not remember how she did so. When she became conscious, she was lying on the ground badly injured, the buggy was overturned, and she did not even know how she got out of the buggy. There was also evidence to the effect that no whistle or other signal of the approach of the train for the crossing was given. Plaintiff further testified that, if she had heard the train or the signal, she would not have gone on the crossing, but would have turned away, and got out of the buggy. Mrs. Boback was severely injured, and on the trial she recovered a judgment for one thousand dollars. The company appealed, and asks us to reverse the judgment for reasons which we will now notice.

In the first place counsel for the defendant contends that this is an effort to hold the railway company responsible for an injury

that resulted by reason of the fright of a horse "at a whistle which was not sounded and a bell that was not rung." "In other words," says counsel, "the court is called upon to say in this case that the company must respond to the plaintiff in damages because her horse took fright at the very stillness of the engineer on his engine." Having adopted this as the basis upon which the action of the plaintiff rested, it is not surprising to find that counsel for the defendant asked the court on the trial to instruct the jury that, in order to recover, the plaintiff must show that "the failure of the defendant to ring the bell or sound the whistle at the public crossing caused the horse to take fright and run away." That is to say, as we understand the contention of counsel, a traveler who claims damages for an injury which he alleges resulted from a runaway at a railroad crossing caused by reason of the failure of the employees of the company to give the statutory signals must, in order to recover, show that the horse was frightened, not at the train, but at the failure to give the statutory signals. To comply with this rule, the traveler would have to show that his horse was acquainted with the fact that trains were required or accustomed to give such signals for crossings, and became alarmed on noticing that the train in question failed to give them.

Horses are very intelligent animals, but we doubt if they are quite as intelligent as this instruction asked by counsel assumes them to be. A rule of that kind would put an undue burden on plaintiff, and, if adopted, would practically relieve railway companies from liability to damages in such cases.

The signals for crossings are required, not for the horse, but for the driver of the horse, in order that he may have notice that a train is approaching, and may be thus warned to keep off the crossing. Horses often become frightened at trains, even though the trains be operated with due care, and one object of the statute was to warn persons about to pass crossings with horses, so that they may make due preparation to guard against the consequences of such fright.

The question then was, not whether the horse became frightened at the failure to give the signals, but whether the failure to give the signals led plaintiff into a more dangerous position than she would otherwise have occupied, and thus caused the injury of which she complains. The instruction asked, we think, would have been altogether misleading, and was properly refused.

Another instruction which the defendant asked, and which

the court gave, was, we think, also incorrect and misleading. The objectionable part of this instruction was as follows, to-wit: "If you find from the evidence that the plaintiff, while driving along the public highway and near a public crossing over defendant's tracks, discovered the approach of one of defendant's trains, and, realizing that her horse might take fright at such train, got out of the buggy, and went to the horse's head, and took hold of the bridle, and attempted to hold the horse, and prevent it from running away, and that, while so attempting to hold the horse, the horse did become frightened at such train, and broke away from the plaintiff, and threw her down, and dragged the buggy over her, and thereby injured her, then your verdict should be for the defendant, for it was the duty of the plaintiff to prefer her own personal safety to that of the horse and buggy, and she had no right to increase the liability of the defendant by involving her own life and limb in order to save the value of the horse and buggy."

It will be noticed that this instruction made it contributory negligence *per se* for the plaintiff to undertake to prevent the horse from running away by catching hold of the bridle near his head. Under this instruction, it would have been the duty of plaintiff to remain in the buggy, or, having got out of it, to abandon any attempt to restrain the horse, or at least to keep away from the front of the horse.

Now, it is a well known fact that a frightened horse can be more easily restrained by catching hold of the bridle near his mouth or head than by holding to the end of the reins. Prudent people, when they have opportunity to do so, often take this means of restraining frightened horses, and we have never heard before that it is as a matter of law negligence to attempt to do so. But, if we should concede that the statement in this instruction that plaintiff was bound to prefer her own safety to that of the horse and buggy was correct in some cases, yet even then the fact that the infant daughter of plaintiff was in the buggy to which the frightened horse was hitched justified her in using every exertion, and even to endanger her own person, in order to restrain him and save the child from injury. But we are well satisfied that it can not be said, as a matter of law, that plaintiff was guilty of contributory negligence in catching hold of the bridle at the head of the horse in the endeavor to restrain him. On the contrary, if she, after getting out of the buggy, had abandoned it, and made no attempt to restrain the frightened horse, and afterwards sued for the injury to

her buggy and child, we feel very certain that she would have been met by the charge of contributory negligence for failing to make any attempt to prevent the injury, and we are by no means sure that under such circumstances there would not be good grounds for such a defense.

The only excuse that we can see for giving that instruction is that the manner of the injury, as alleged in the complaint, is a little vague, so that the court may have been of the opinion that plaintiff alleged that she was injured by being thrown from the buggy, and for that reason held that she could not recover if she was already out of the buggy, when the horse ran away. But the complaint does not allege that she was thrown from the buggy. It alleges that her horse "became frightened, ran away, overturning the buggy and throwing her violently to the ground, by which fall she was severely injured." So we do not think the instruction was correct, even if based on that theory, but the language of the instruction shows that it was based on the theory that plaintiff, if she went to the head of the horse and took hold of him, was, as a matter of law, guilty of contributory negligence, and, as before stated, we think that this position is untenable, and much more favorable to the defendant than the law warranted.

The other instructions given by the court, taken as a whole, are not prejudicial to the defendant. While those given at the request of the plaintiff are, it is true, not full enough, so that, if they stood alone, the charge of the court would be subject to some criticism, yet those given at the request of defendant cured these defects; some of them being, as before stated, much more favorable to defendant than the law warranted.

But counsel for the company contend that it was prejudiced by improper remarks of counsel for the plaintiff in his closing argument to the jury. The portions of the argument to which he objects are set out in the bill of exceptions. One of these extracts from the argument of counsel has reference to the question of damages, and is as follows, to-wit: "If she had been injured for life, has she asked for more money than she ought to have? She asks for ten thousand dollars. Now, I ask you, what does it mean to have your wife in her home in that condition? Take her when she is strong, healthy, and with physical force to serve those she loves. What is the difference between that and the prostrate form of this woman who had been so inhumanly criticised here? What does it mean? It means everything that life is worth, and, put dollars and cents by it,

would ten thousand dollars pay her? No! ten times ten thousand would not pay it. With this force she serves those whom God has given her, and all that that means; and when she sits down and considers the fact that all that is gone, why, then, she is overwhelmed with grief that she is so helpless in her home."

Now, this language, being delivered near the climax of the closing argument and under the excitement thereof, may be somewhat exaggerated, as well as a little mixed. The question propounded by counsel to the jury "What does it mean to have your wife in her home in that condition?" would indicate that counsel desired the jury to consider the injury to the family of plaintiff, as well as that suffered by herself, and to that extent the argument was improper; but we can see from the whole extract that counsel was asking damages for injuries to plaintiff only, and not for injuries to others of her household, and this would probably more clearly appear if the whole argument was set out. Counsel in this portion of his argument states no facts not in evidence, and is only giving his opinion of the gravity of the injury proved. If there be some exaggeration, we must remember that it is within the province of counsel for plaintiff in an action for damages to take a sympathetic view of his client's injuries, and to indulge in oratorical flights in his endeavor to impress his views upon the minds of the jury. He should, of course, stick to the law and the evidence and to the questions at issue, and should avoid improper appeals to the jury; but if counsel, in the remarks above set forth, overstepped the bounds of legitimate argument to any extent, we think it clearly appears that no injury resulted. The object of this appeal, as counsel for defendant say, was "to increase the quantum of damages." But counsel for defendant do not claim that the amount of damages assessed is excessive. In fact, if defendant is liable for the injuries of plaintiff, the damages assessed are quite moderate. A physician testified that the "right clavicle" of plaintiff was fractured by the accident, her shoulder dislocated, three ribs broken. Besides these, he said she sustained serious internal injuries, involving the womb and bladder, and injuries to the spine, resulting in partial paralysis of the lower limbs for two months, from which she had not fully recovered at the time of the trial, some effects of which might be permanent. These injuries, he said, had at times affected her mind, and she had suffered greatly from them. But for all these injuries the eloquence of counsel to which defendant objects only induced the jury to allow one thousand dollars, a result

which in our opinion shows that the argument did no harm, for the damages are clearly not excessive.

The other remarks of counsel to which he objected are more serious. In commenting upon the testimony of certain employees of defendant who were on the train at the time of the injury counsel for plaintiff said: "Their bread and meat depends on the fact that they did blow the whistle, because the law required them to do it, and the rules of the company required them to do it, and if they did not do it their company was liable, and they would lose their job."

In justification of this argument counsel for plaintiff say that it was shown that these witnesses were employees of the defendant company, and that its rules and the law required them to ring the bell or sound the whistle at every crossing. It was, therefore, they say, "certainly not improper for counsel to call attention to these facts, and to say that, if these witnesses had admitted on the stand that they had failed to perform their duty, and by reason of such failure made the company liable for damages, they might be held accountable for it by the company, and might lost their jobs."

If counsel had said no more than that, there would have been nothing in the objection. But counsel went farther than this. He did not stop at showing the connection between the witness and the defendant company, and calling attention to the reluctance which it might naturally be supposed a witness would have to testifying in such an action that he had been guilty of a breach of duty which would render his employer liable in damages, and might subject him to a discharge for his fault. Counsel had the undoubted right to call the attention of the jury to these matters and the jury had the right to consider them. But counsel went further, and stated as a fact, though there was no evidence to show it, that the bread and meat of these witnesses depended on the fact that they did blow the whistle, and that if they did not do so they would lose their jobs. In other words, counsel stated, in effect, that, if these witnesses had not testified that the whistle was blown, they would have been discharged by the company, and that they therefore testified under a sort of compulsion. But there was no evidence that this was true, and the argument was improper and unfair. The court should have sustained the objection to it, and we think he erred in refusing to do so. *East Tenn. R. Co.* v. *Bayliss,* 75 Ala. 466; *German-Am. Ins. Co.* v. *Harper,* 70 Ark. 205; *Prescott Ry. Co.* v. *Smith,* 70 *Ib.* 179.

It is difficult to lay down an exact rule as to when the court

will reverse a case on account of an improper argument of counsel for the successful party. That must, of course, depend upon the nature of the argument, the circumstances under which it was made, the action of the trial court, and the probable effect of the argument upon the verdict of the jury. Now, we can see that, under the circumstances here, counsel, by this language, may have intended only in a sort of dramatic way to call the attention of the jury to the connection between the witness and the defendant company. The presiding judge, who must necessarily have some discretion in the matter of regulating arguments, probably so understood it, or he would have excluded the remarks.

Though we think the argument was improper, yet we do not think that either the argument or the ruling of the court thereon were so obviously prejudicial as to compel us to reverse the case under all circumstances. Notwithstanding that we disapprove the argument, yet we still have the discretion to affirm the judgment, if convinced that it is right and that no prejudice resulted.

Now, one phase of the evidence does, as it seems to us, show clearly that the employees in charge of the train were guilty of negligence contributing to the injury. There were two engineers on the engine. One was a new man, unacquainted with the road, and the other one was going over the road with him to point out the crossings and stopping places. These two engineers and a brakeman testified for the company. It appears from their testimony that, as the train rounded the curve, and they came in sight of the crossing about one hundred yards ahead, they saw the position of the woman and the horse. The woman, they say, was out of the buggy, and was holding to the bridle at the head of the horse trying to restrain him. The horse seemed to be frightened, and was trying to get away. One of the employees testified that when he first saw the horse "he seemed to be scared, with his head up, and prancing." Another one said: "The first thing in my mind was the horse was trying to run away. I was afraid the horse would run away." There was a slight up grade there, and at this time, to quote the language of these witnesses, the engine was "working steam, making a puffing noise," as it approached the woman and the frightened horse. But, although these employees saw that the horse was frightened, and likely to run away and injure the woman and child, they made no attempt to stop the train by shutting off steam to lessen the noise until after the horse broke and ran away. On this point the engineer who was showing the other over the road

testified as follows: "There was a child in the rig, and when the horse started to run away I was afraid the child would get killed, and I hallooed at him to stop, and he shut off steam, and applied the brakes; but before we could get stopped the woman was up, and had the child on her feet, and I told him to go ahead." On being asked whether he had made any attempt to stop the train before it passed the crossing, he answered: "Not until the horse started to run and knocked the woman down. The woman fell when the horse began to rear, and the wheels of the buggy went over her, and I thought that the child would be killed, and told the engineer to stop, and he shut off steam and applied the air."

This testimony, as before stated, shows that these employees were guilty of negligence in not making some effort to stop the train, or at least in not shutting off steam, and thus lessening the noise, when they saw that the horse was frightened and likely to run away, and that the woman and child were in danger.

As these facts were shown by the testimony of the employees of the company, if the verdict had been based on a finding that the injury was caused by this negligence, we should have felt no doubt about affirming the judgment, notwithstanding the improper argument of counsel. But an examination of the record shows that no such question as this was presented to the jury. The plaintiff based her right to recover solely on the ground that the employees in charge of the train had failed to give the signals for the crossing required by the statute, and that in consequence thereof she was injured. This is the only ground of negligence alleged in the complaint or presented to the jury by the instructions, and the only charge on which the defendant was tried, so we cannot in support of the judgment consider other grounds of negligence which defendant has not been called upon to answer.

On the question whether signals were given upon which plaintiff based her right to recover, there was some conflict in the evidence. The two engineers and the brakeman testified that the signals were given, but their testimony is not quite satisfactory on that point. The brakeman's answer to the question in reference thereto was: "I can not remember for sure. It seems that I remember that the whistle was sounded, but I can not say for sure that it was." The answer of the engineer who was showing the enginer in charge over the road to this question was: "No; I am satisfied that he blew the whistle for the crossing. I was sitting in front of him, and it was my duty to learn him the road, and I

would motion for him to pull the whistle, and he would whistle."
The answer of the other engineer to that question was: "Yes;
that is my best knowledge." Both of the engineers were exam-
ined at some length on this point, and both testified that the whistle
was blown, but their testimony impresses us with the belief that
their recollection on that point was not quite clear, and that their
conviction that the whistle was sounded arose in part at least from
their knowledge that it was their custom to blow whistles at cross-
ings. On the other side, in addition to the plaintiff, five or six
witnesses testified that the whistle was not blown for the crossing.
The testimony of several of these witnesses, none of whom were
interested, was that they noticed at the time that the whistle was
not blown, and on that account they testified positively to that fact.
One of these witnesses was put on the stand by the defendant. Tak-
ing the whole evidence, it seems reasonably certain to us that the
preponderance of the evidence was in favor of the plaintiff on this
point, and that the finding on that point was right. On the ques-
tion of whether this failure to sound the whistle was the proximate
cause of the injury, there is room for doubt, but the decision of this
question depended on the testimony of the plaintiff, and could not
have been affected by the argument above noticed. Counsel for ap-
pellant has argued with much force on this point that the failure
to ring the bell or sound the whistle was not the proximate cause
of the injury. We have felt some doubt about it, but after due con-
sideration thereof we think the evidence sufficient to sustain the
verdict. It justified the jury in finding that by reason of the fail-
ure of the company to give the statutory signals plaintiff attempted
to pass a crossing while a train hidden from view by a hill was
rapidly approaching; that she narrowly averted a collision; was
taken so unexpectedly that she had barely time to get to the head
of her horse in her effort to restrain him when, frightened by the
train, he broke and ran away, throwing her down and injuring her;
that had the signals been given she could have made better prepara-
tion for the approach of the train, and probably avoided the injury.

There is nothing in the evidence to show that this horse was
vicious or easily frightened by trains, beyond the fact that he ran
away on this occasion. But the circumstances under which he did
so were exceptional, and such as might frighten even a gentle
horse, so we do not think that is sufficient to show that plaintiff was
guilty of contributory negligence in driving him on the day of
the accident.

We are convinced from the evidence and the reasonable amount of damages assessed that counsel for defendant fully upheld his side of the controversy before the jury, and that no prejudice resulted to the defendant on account of any error of the court or improper argument of counsel.

The judgment, we think, is right, and should be affirmed. It is so ordered.