Arkansas Power & Light Co. v. Hoover.

Opinion delivered January 12, 1931.

*Robinson, House & Moses, McRae & Tompkins* and *Mahony, Yocum & Saye,* for appellant.

*Tom J. Terral* and *William F. Denman,* for appellee.

MEHAFFY, J. J. T. Hoover, a young man twenty-one years of age and unmarried, was killed in the town of Brinkley, Arkansas, about seven o'clock P. M., November 29, 1928, by coming in contact with a live wire carrying 2,300 volts of electricity.

Appellant owned and used wires charged with electricity in the operation and maintenance of a power and light system in the town of Brinkley.

It is alleged that the appellant, its agents and servants, had carelessly and negligently allowed and permitted its electric light wires on Main Street of the town of Brinkley to become broken and to fall on and across the concrete sidewalk on Main Street of the town of Brinkley. It is alleged that the lines were old, worn, and defective, and that the insulation thereon was worn out and completely gone at the place where the wire had fallen, over the above said sidewalk where plaintiff's intestate was killed. The public, and especially the plaintiff's intestate, used this sidewalk at the place where plaintiff's intestate was killed, many times each day in going about the town of Brinkley. On the date of the injury, November 29, 1928, after dark, plaintiff's intestate, while going from his home to the business section of the town of Brinkley, attempted to pass the point where said wire was across the sidewalk, ran into said wire, and was horribly burned and electrocuted because of the carelessness of the defendant, Arkansas Power & Light Company, its agents and servants.

It was alleged in the complaint that the Arkansas Power & Light Company was negligent in using old, worn, and defective wires at and near the point where plaintiff's intestate was killed; that appellant knew, or by the exercise of ordinary care could have known, that said wires were old, worn, and defective and that the insulation was completely gone, at a point where many peo-

ple during the day and night passed directly under the said wire. And it was alleged that appellant was negligent in its failure to remove the wires. It was alleged that J. T. Hoover was in the exercise of due care at the time of his injury, that prior to the injury he was a stout and able-bodied man, was industrious, and had been rapidly promoted in his line of work; that he contributed the greater part of his earnings to his father and next of kin, and that it was his intention to continue to provide for his father and next of kin; and that, because of the negligence of appellant, the said J. T. Hoover suffered great and excruciating pain and misery after his injury until the time of his death.

The appellant filed a motion to quash service of summons, and alleged that the person served as agent of appellant was not an agent, servant, or employee in charge of a branch office or other place of business of defendant. The motion to quash service of summons was overruled and exceptions saved. Appellant thereupon filed answer denying all the material allegations of plaintiff's complaint.

Mrs. Mallie Hoover, mother of J. T. Hoover, testified in substance that she was the administratrix of the estate of J. T. Hoover, deceased; that he died on October 29, 1928, and was twenty-one years old the ninth day of August before his death. Witness saw him alive at his home on the 29th of November at night, some time after six o'clock. He had been employed up until that afternoon and had come home to get work elsewhere. He worked all the time at something; gave part of his earnings to his father; he had never married. Copies of letters of administration were introduced. Witness further testified that her son had always lived in her house. He had worked away from Brinkley but Brinkley was always his home. He worked in Stuttgart helping his father. He went to work in the bank when he was seventeen or eighteen. Witness said she had seen her son give his father clothes but could not say whether she ever saw him give him money. She had seen checks he had written

for his father, but does not remember the amount of the checks and does not know whether they were loans or gifts.

M. M. Hoover, father of J. T. Hoover, testified also about his son and about his character and inclination to work. The father was selling hats at the time the son was killed, but was not able to do much work; was 60 years old at the time of the trial. Witness could not say that deceased was employed at the time he was killed, but on Sunday before he saw his son and he was employed then. His son was employed in 1923 and 1924 and earned $65 and his board. He then went to work at the bank; worked at the bank about three years and then went on a rice farm and ran a pump for a while; when he left the rice farm he went to Pine Inn Camp, and was working there the Sunday before he was killed. He was employed constantly, all the time; could not tell the dates or instances when his son gave him money, but he gave it to him at various times on various occasions; would just hand it to him; biggest sum he ever gave him was $35; gave him wearing apparel. Witness' health has been poor for last ten years, and he was unable to work; stated that he believed his son gave him $50 once when he bought an automobile.

R. L. Blakely testified about the place of business, but this testimony was excluded by the court.

The evidence shows that the deceased, J. T. Hoover, was walking along on a concrete sidewalk and came in contact with one of appellant's wires which had fallen on the sidewalk and was injured and killed. The insulation was worn off of the wires, the wire was rubbing against the tree and limb. This had been reported to the appellant on numerous occasions; and they would go out and put new insulation on. Wires were just strung through the trees, and every time there was a wet spell or the wind would blow there would be fire and burn the trees. There were no poles at that place.

Some of the witnesses testified that the wires went through the trees and that the wire was naked and bare,

and that in wet rainy weather you could see sparks fly and run through the trees.

The wire at the place where Hoover was injured, was burned in two. It was a number 6 wire and carried 2,300 volts. The wires pass through the branches of the trees between the poles. The accident happened on Thanksgiving evening about 6:50. There was a big blaze up in the tree and down on the ground.

The representatives of the appellant not only had been notified, but reached the place where the wire was down before Hoover did. Appellant's employee knew where the wire was on the sidewalk, but was trying to find the other end. While he was looking for the wire up in the trees, Hoover came along and was practically on the wire when witness saw him and hollered at him. A rug was obtained and put around the wire, and in this way the wire was pulled away from him. When Hoover came in contact with the wire, he did not fall, but stood there and groaned, and when the wire was pulled away from him he fell. Appellant's witnesses testified in substance that Hoover was killed instantly. A number of witnesses, however, testified that he lived and suffered three or four hours. Witnesses tried from the time he was injured until about eleven o'clock to resuscitate him. Assisting in the effort to revive him was a physician and some of the employees of appellant.

Appellant contends that the court erred in overruling its motion to quash the service. The summons was served on L. A. Atkins, who testified that he lived at Waterloo in the southern part of Nevada County, Arkansas; was manager of the Guthrie Bros. Drug Store, which is owned by the Guthrie Brothers of Prescott; that he was not in charge of any office or place of business of the Arkansas Power & Light Company in Nevada County. Witness said the only way he was connected with them is they send him the local bills for electricity for the houses in Waterloo through the local office at Stephens, and that they come in there and pay their bills and witness receipts for them. Bills for the houses supplied with elec-

tric current in Waterloo amount to something like $100 a month. The bills are sent to Atkins from Stephens. They are a combination receipt and bill. A receipt for the men who owe the bills and a duplicate receipt. Witness tears off the duplicate and gives them the receipt proper and keeps the stub. Bills are sent to witness through the mail from the office of the Arkansas Power & Light Company at Stephens; does not have anything to do with making the charges or fixing the charges; receives ten dollars per month, something like ten per cent. The work witness does for the Arkansas Power & Light Company is carried on in the Guthrie Drug Store. The Arkansas Power & Light Company has no interest in the drug store, does not pay any rent, and does not own the building. Witness does not keep any records in the conduct of the business; makes no effort to collect bills, but, if a person comes in to pay his bill, he receives the money. They are supposed to pay the bills by the 15th of the month, and if they do not they are turned over to the representative who goes out and collects them. Witness does not go out of the store about this business at all.

Arkansas Power & Light Company has a warehouse at Waterloo, but no other place of business. Witness collects local bills. Wires and poles are strung in different parts of the county and current is sold to users about Waterloo. Bills are made out in Stephens and mailed to witness, who puts them in his desk, and, if the parties come in, receives the money from them; puts the money in the safe until the 15th of the month and then a fellow comes out from Stephens, takes the duplicates, figures out what witness has collected, and the amount is turned over to him. Witness works for the drug store, which pays him a salary. The telephone exchange is also in the same building, and witness collects for them, but does not go out of the office for them. Witness is the person they pay the bills to for the Arkansas Power & Light Company, the local light bills; does not know whether he is the only man - at Waterloo authorized to receive money for the company. Bills are sent to witness, he receives

the money, and transmits it to the Arkansas Power & Light Company and they pay him a salary of ten dollars a month. That is the only place of business they have in Nevada County in Waterloo, and witness is in charge of it; does not render any service for the Arkansas Power & Light Company except as above stated. There are no signs except the drug sign on the building. The desk is where all of the business of the drug store is carried on. There is no separate desk for the Arkansas Power & Light Company. A man named Clark works for the Arkansas Power & Light Company and lives upstairs over the warehouse. Clark looks after trouble if they have any. "The bills are sent to me, sometimes addressed to L. A. Atkins and sometimes to the Guthrie Drug Store. That is the only place at Waterloo that the Arkansas Power & Light Company receives payment of bills." When witness first started to work for the company, he received ten per cent. which would run around ten to twelve dollars a month. They now pay witness ten dollars per month.

C. A. Brussard testified that he knows Atkins, who runs the drug store, and that he goes there to pay the light bill; does not know whether Atkins performs any service for the company further than to collect bills. Witness takes current from the Arkansas Power & Light Company and pays the bill to L. A. Atkins. If witness remembers, the receipts are signed either L. A. Atkins, or Arkansas Power & Light Company, by L. A. Atkins.

W. C. Clark testified that he lives at Waterloo and is trouble shooter for the Arkansas Power & Light Company; that the company has a warehouse at Waterloo, and they keep a bunch of stuff in stock for emergency. The warehouse serves the Waterloo territory with lights and power, residences, oil field motors, and things of that sort. Waterloo is not a very large town, and the field is scattered. It is an oil field town. Witness knows Atkins, and says he is just an agent there for the Arkansas Power & Light Company for them to pay their bills

to. The bills of persons who do not come in and pay Atkins are sent to witness, and he is supposed to go out and collect them or disconnect the service. Witness is just trouble shooter and has nothing to do with collecting bills until the 15th. He is an electrician and goes out and tells them if the bills are not paid the current will be cut off.

The only question is whether service on Atkins was such service as is required under § 1152 of C. & M. Digest. This section provides that corporations who keep or maintain in any of the counties of this State a branch office or other place of business is subject to suits in any of the courts in said county where the corporation so keeps or maintains such office or place of business, and service of summons or other process upon the agent, servant, or employee in charge of said office or place of business shall be good service, etc. It will be observed that the service may be upon the agent, servant, or employee in charge of the office or place of business. The collecting of pay for the current would appear to be about as important a business as any other business they do. Collecting the bills is certainly a very important part of the business of the company at Waterloo. The appellant contends, however, that the fact that there is no sign upon the drug store carrying its name, and that it had no desk, no furniture or fixtures or anything else there, is evidence that it did not have a place of business or office. They also say that if a difficulty arose between appellant and its customers Atkins could not settle it, and that Atkins was not such an agent as could be depended upon with reasonable certainty to apprise the corporation of the service had upon them. The fact that he was not authorized to settle disputes between the company and its customers is no evidence at all that he was not in charge of the office or place of business, and as to not being able to depend on him to advise the corporation that he had been served would probably depend very much more on the character of the man than it would

on the kind of business carried on. In this case, however, Atkins did apprise the corporation of the service upon him, and it was in no way prejudiced by his failure to act.

Appellant cites and relies on *Ft. Smith Lumber Co. v. Shackleford,* 115 Ark. 272, 171 S. W. 99. In that case the court, among other things, said: "The words 'branch office' and 'other place of business' are not synonymous, as contended by the learned counsel for appellant. The word 'other' distinguishes the term 'place of business' from the term 'branch office,' and shows that the Legislature intended that wherever the corporation maintained a 'place of business,' whether they had or did not also have an office at the same place, that service could be had upon the corporation by service upon the employee in charge of the business at that place."

The court also said in that case: "The agent, servant or employee in charge of a branch office, under the statute, must be one having authority to carry on the general business of the company. But not so as to the agent, servant, or employee in charge of the 'other place of business.' His authority may be only limited and special and confined to the particular business over which he has supervision. To be sure, the statute contemplates that there must be maintained a place where a well defined line of business is carried on with an agent in charge of that business. Elliott was such an agent."

The next case cited and relied on by appellant is *Terry Dairy Co.* v. *Parker,* 144 Ark. 401, 223 S. W. 6. In that case the court quoted with approval from the case in 115 Ark. as follows: "Any agent competent to conduct such a business could be depended upon with reasonable certainty to apprise the corporation of the service upon him. It was the design of the Legislature that service could be had upon an agent of this character, and that when so obtained it should constitute service upon the corporation itself."

In the instant case the agent was intrusted with the money collected, his duty being to receive and receipt for

it, and transmit it to the company, a business as important, if not more so, than any other business it had in the county, and if he were competent to conduct such a business, he could be depended upon to notify the corporation of service upon him. And the facts in this case show that Atkins did actually apprise the corporation of the service upon him. The important thing in determining this question is that the corporation itself established a place of business where its bills could be paid and receipted for, and when a corporation establishes such a place and receives and receipts for money paid for its service through an agent, it has for all reasonable and practical purposes established such a place of business as mentioned in § 1152 of C. & M. Digest. *Davis* v. *Motor Parts Corp.*, 16 Fed. Rep. (2d Series) 148.

"Brown was at least the agent of the company at El Dorado for the purpose of representing it in making the collection of dues and assessments from the members of the company holding certificates therein, and receipting for the same. He signed receipts as local secretary; that is he designated himself as local secretary of the plaintiff company. In his testimony he said he was collection agent for the company at El Dorado. In the notices of assessment sent out from the home office he is referred to both as local secretary and as branch secretary of the company. He also signed one of the papers in evidence as secretary of the local board. * * * We do not think it could do any business here through an agency for that purpose, without at the same time being here for the purpose of service. If the company thought it proper and to its interest to have a local secretary or secretary of a local branch of said company here to do business for them, even to the extent of collecting and receipting assessments and forwarding them to the home office, we think, in the absence of any other officer or agent of the company upon whom service could be had in the county, that service upon him is good under our statute." *S. W. Mutual Ben. Assn.* v. *Swenson,* 49 Kan. 449, 30 Pac. 405.

We think, if the Arkansas Power & Light Company thought it proper and to its interest to have an agent in Nevada County, doing business only to the extent of collecting and receipting for light bills and forwarding the money collected to the appellant, in the absence of any other officer or agent of the company, upon whom service could be had in the county, that service upon the agent conducting this business is good under our statute.

Appellant's next contention is that instructions 1 and 2, given in behalf of appellee, are abstract and in conflict with instruction No. 4 given in behalf of the defendant. Instruction No. 1 told the jury ''that the burden of proof in this case is upon the plaintiff to show by a preponderance or greater weight of the evidence that the deceased, James Talmadge Hoover, lost his life on account of the negligence of the defendant, and to show further that the negligence of the defendant, if any is shown, was the proximate cause of the deceased's death, and further that the deceased was not guilty of contributory negligence.''

Instruction No. 2 complained of is as follows:

''You are instructed that companies supplying electric currents are bound to use reasonable care in the construction and maintenance of their lines. This care varies with the dangers that will result from the negligence on the part of the company, if any. Reasonable care is such care as a reasonable man would use under ordinary circumstances, and, in determining whether such care has been exercised, the jury will take into consideration the location of the lines, whether in thickly or sparsely settled communities, the harmless or dangerous character of the current carried by such lines, and their remoteness or proximity to the people who may pass by and all other circumstances in evidence.''

Neither of these instructions is abstract, but each is a correct statement of the law.

Appellant contends that no one can say which of the charges of negligence the jury found the appellant to be guilty of. That may be true, but we know that the verdict was not based on the appellant's failure to insulate

the wires because instruction No. 4 expressly told the jury that it was not the duty of the defendant company to have insulated the wire. Instruction reads as follows: "You are instructed that it was not the duty of the defendant company to have insulated the wire which the deceased came in contact with for the protection of life or property."

Moreover, this instruction was erroneous and should not have been given. We have repeatedly held that it was the duty of the company to keep its appliances in safe condition and that either the wires must be kept insulated, or must be so located as to be, comparatively speaking, harmless. If the company does not choose to properly insulate a deadly wire of its maintenance, it must place the same under ground, at a high altitude, or at some inaccessible place.

We said in a recent case: "The authorities appear to be unanimous in holding that there is no such duty, [to insulate all wires] but the cases do hold, as we understand them, that this duty must be performed, or other sufficient safety methods employed to prevent contact with wires conveying the current at such places as danger of contact may reasonably be anticipated. *Ark. P. & L. Co.* v. *Cates,* 180 Ark. 1003, 24 S. W. (2d) 846.

The law as to the duty of electric companies was discussed at length in the above case, and we do not deem it necessary to cite the authorities here or discuss it further, because there is no contention about the fact that on the question of negligence and contributory negligence the case was submitted to the jury on proper instructions, and the jury's finding is conclusive.

Appellant next contends that the case should be reversed because of prejudicial remarks made by both counsel for appellee in their arguments to the jury. After the remarks to which appellant objected were made, the court admonished the jury that they should try the case solely according to the law as given by the court and the evidence from the witness stand, and, when objection was

made a second time, the court said: "Gentlemen of the jury, I tell you again that you are to try this case solely according to the law and the evidence the witnesses gave and nothing else."

There were some remarks of one of the attorneys for the plaintiff to which objection was made and the court overruled the objection. One of these remarks was as follows: "If the defendant in this case was an individual, it would be indicted and sent to the penitentiary." Appellant urges that there is nothing in the case to send either an individual or a corporation to jail, the penitentiary, or even to impose a fine upon either of them. We do not agree with appellant in this contention. The undisputed evidence in this case shows that Hoover was killed by the negligence of the appellant, and the statute provides that if the killing be in the commission either of an unlawful act or in the prosecution of a lawful act, done without caution and circumspection, it should be manslaughter. And every person convicted of manslaughter may be imprisoned in the penitentiary. Therefore if an individual in the prosecution of a lawful act does so without due caution and circumspection, that is if he does it negligently and kills some person, he is guilty of manslaughter, and the statement of the attorney to which objection was made was not an erroneous statement as suggested by appellant. Moreover, statements like the above are frequently made in the heat of argument and everybody, including the jury, understands the circumstances under which they are made, and in this case the remarks were not prejudicial.

The attorney also said in his closing argument: "If the witnesses for the defendant testified against Henry Yocum, they would not have a job in the morning." Henry Yocum referred to is one of the attorneys for the defendant.

The attorney also said: "Gentlemen, go out there and in the name of God, and law, have a backbone—go out there and think of yourselves, your own flesh and

blood—not a back alley, not on a side street, not out in the woods. Your little boy and girl may leave home and start to a picture show. There was a wire down up here by the Prescott Furniture Company and they had 'phoned 25 times: 'For God's sake fix it, fix it,' and they did not fix it."

Appellant argues that this statement was loaded with dynamite. Most of the statement was based on the evidence. Certainly that the wire was down, and that appellant had been notified many times is shown by the undisputed evidence, and whether the lawyer tells the jurors to think about their own children or not they would certainly do it. This court has many times discussed the question of remarks made by counsel in argument of a case, and we call attention to the following cases: *St. L. I. M. & S. R. Co.* v. *Boback,* 71 Ark. 427, 75 S. W. 473; *American Ins. Co.* v. *Mordic,* 168 Ark. 795, 271 S. W. 460; *United Order of Good Samaritans* v. *Lomax,* 172 Ark. 330, 288 S. W. 709; *St. L. I. M. & S. R. Co.* v. *Hairston,* 125 Ark. 314, 188 S. W. 838; *St. L. I. M & S. Ry. Co.* v. *Raines,* 90 Ark. 406, 119 S. W. 665; *St. L. I. M. & S. R. Co.* v. *DeVaney,* 98 Ark. 83, 135 S. W. 802.

In this last case the court said: "The statement of the attorney in his argument in this case that the defendant had treated the plaintiff worse 'than you would treat a dog,' was only the expression of opinion at the most, the jury could not have understood thereby the counsel was making a statement relative to a fact not adduced at the trial."

And in the Boback case mentioned above when objection was made to remarks of the attorney, the court said: "Now, this language, being delivered near the climax of the closing argument and under the excitement thereof, may be somewhat exaggerated as well as a little mixed. * * * If there be some exaggeration, we must remember that it is within the province of counsel for plaintiff in an action for damages to take a sympathetic view of the client's injuries and to indulge in oratorical flights in

his endeavor to impress his views upon the minds of the jury."

Counsel for appellant called attention to a number of authorities where this question is discussed in addition to the ones we have mentioned, but it must be kept in mind that an attorney in making an argument has the right to impress his views on the jury by all proper means, and in the heat of argument may say things at that time that he would not otherwise say. It should also be kept in mind that the jury are composed of men of sense and honesty, and are about as ready to resent unfairness as any class of men in the country. Moreover, there must necessarily be left large discretion with the trial court, who presides at the trial, and hears the entire case tried, and the presumption is also that he would not intentionally permit any unfairness or improper conduct on the part of either attorney.

We do not think that the remarks of the counsel which were objected to call for a reversal of the case.

It is next contended by appellant that there is no substantial evidence to support the verdict in the sum of $10,000 for the benefit of the father who was the next of kin, and that the verdict of $10,000 is grossly excessive. We do not think that the evidence is sufficient to sustain a verdict of $10,000. There is, however, substantial evidence from which the jury might have found that the deceased did contribute considerable amounts to his father, and that he would continue to do so. We have reached the conclusion, however, that the evidence as to this question is not sufficient to sustain a verdict for more than $5,000, and the judgment in favor of the father for $10,000 is therefore reduced to $5,000.

Appellant's next contention is that the evidence is not sufficient to support a verdict of $7,000 for pain and suffering, and this argument or contention is based on the alleged fact that there is no substantial evidence in the record to show that deceased ever suffered any conscious pain and suffering. We do not agree with appellant

in this contention. There is ample evidence to show conscious pain and suffering. Some of appellant's witnesses testified that the deceased lived after the injury for something like three hours and suffering during this time. The evidence is that he groaned, and that when they would ask him to turn over he would try to do so. Some of appellant's witnesses testified that he was killed instantly, and yet these same witnesses testify that they assisted from about 7:30 to 11:00 o'clock trying to resuscitate him. It is difficult to believe that persons would work three hours trying to revive a person they knew was dead, but, whether that testimony was believable or not, it was in conflict with the testimony of other witnesses, and the jury's finding on this made it conclusive.

In the case of the *Mo. Pac. Rd. Co.* v. *Bushey,* 180 Ark. 19, 20 S. W. (2d) 614, a verdict of $9,463 for pain and suffering was upheld. There was a total judgment in the above case for $48,500. In that case the deceased suffered about three hours.

The judgment for $7,000 for pain and suffering is sustained by the evidence.

The judgment of the circuit court will be modified as to the judgment in favor of the father, reducing that to $5,000. In all other things it is affirmed. It is so ordered.

SMITH and McHANEY, JJ., dissent, and BUTLER, J., dissents because of the remarks of attorney.

BUTLER, J., (dissenting). I agree with the majority that the evidence is ample to establish the negligence of the appellant and the ordinary care for his own safety of the deceased. I also am of the opinion that there was substantial evidence to establish conscious pain and suffering, and that the verdict of $7,000 for such was not excessive.

But I can see no substantial evidence to warrant a verdict for more than nominal damages for loss of contribution to the father, the next of kin. The deceased had attained his majority, and no substantial contribution to

the support of the father was shown. The most that was proved was that the son occasionally gave the father small gifts of wearing apparel, a few gifts of money not to exceed five dollars and $50 at one time to apply on the purchase price of an automobile. This seems to me to be insufficient to indicate with any reasonable degree of certainty that the son would, in the future, contribute any substantial amount to the support of the father. ·

The witnesses whose testimony tended to exonerate appellant from liability were its employees. Henry Yocum was its attorney and active in the defense. One of appellees' counsel during the course of his argument, over the objection and exception of appellant, was permitted to tell the jury in effect that if these witnesses had testified against Henry Yocum they would not have a job the next day. Statements similar, in their import have been frequently condemned by this court and held to be reversible error to permit them to be made to the jury. These decisions, none of which have been overruled or their authority impaired, call for a reversal of this case.

I therefore hold that for the reasons stated this case ought to be reversed and remanded for a new trial, and I respectfully dissent.

SMITH, J., (dissenting). I do not get far enough into this case to consider many of the assignments of error which the majority discuss, for the reason that, in my opinion, there was no service and the motion to quash the service of summons should have been sustained.

The statute (§ 1152, C. & M. Digest) does provide that "Any and all foreign and domestic corporations who keep or maintain in any of the counties of this State a branch office or other place of business shall be subject to suits in any of the courts in any of said counties where said corporations so keeps or maintains such office or place of business, * * *," and that service of process upon the agent, servant or employee in charge of said office or place of business shall be deemed good and sufficient service upon said corporation." But I submit

that, under the facts stated in the majority opinion, the defendant did not have, keep or maintain a branch office or other place of business in the village of Waterloo, within the meaning of the statute from which I have quoted. Every one recognized *Terry Dairy Co.* v. *Parker,* 144 Ark. 401, 223 S. W. 6, as a border line case on the subject. Indeed, there was a vigorous dissenting opinion in that case as to the sufficiency of the service, but there were important facts present in that case which are absent here. It was there said: "The facts of the present case show that the appellant was maintaining at the town of Hazen a place where it was conducting a well-defined line of its business. The appellant, as its name implies, is engaged in a business in which a supply of milk is indispensable. For its convenience, it had a building on the railroad equipped with machinery, which it designated as its plant No. 3. This building had in it a desk which the agent in charge used in making daily reports of the business. The agent was employed on a salary. The building was equipped with the necessary machinery for cooling the milk, and the business of the company was that of obtaining from the farmers in that locality a supply of milk to be shipped to its principal place of business at Little Rock. The building was duly equipped and appointed, and the agent was supplied with the necessary material for successfully conducting that part of appellant's business."

Now, it does appear that appellant maintained a warehouse at Waterloo, in charge of a trouble shooter by the name of W. C. Clark, and that it kept in this warehouse various parts and materials for maintaining and repairing its power lines. But there was no service on Clark. The service was had on L. A. Atkins, a clerk in the Guthrie drug store; and there is no contention that there was any connection between appellant and the Guthrie drug store. Atkins, an employee of this drug company, made collections for and remittances to the appellant power company, for which he was paid $10 per

month. Nothing more was contended or is stated in the majority opinion, and this was done in a building which neither Atkins nor appellant power company owned or controlled, and, certainly, these simple transactions would not convert the Guthrie drug store into "a branch office or other place of business" of the appellant power company.

If the service upon Atkins did not meet the requirements of the statute—and I submit it did not—then, certainly, it could make no difference that Atkins may have advised appellant company what had happened. There was no authority to serve Atkins with a copy of the summons, his report that this had been done comes to naught. The requirements of the statute could not be nullified and dispensed with in this manner.

I therefore respectfully dissent.