ARK. POWER & LIGHT CO. *v.* McGOWAN, ADMR.

5-1088                                    296 S. W. 2d 420

Opinion delivered December 10, 1956.

56

*Holmes & Holmes* and *House, Moses & Holmes,* for appellant.

*John W. Elrod* and *Max M. Smith,* for appellee.

LEE SEAMSTER, Chief Justice. This suit was brought by the appellee, Homer E. McGowan, Administrator of the Estate of Billy E. McGowan, deceased, to recover damages for personal injuries and resulting death of decedent, which was caused by deceased coming in contact with appellant's high-powered electrical transmission line. The trial resulted in a verdict and judgment against appellant for $11,450. This appeal follows.

For reversal, the appellant cites two points (1) the Court should have directed a verdict for appellant, and (2) there was insufficient proof of pecuniary loss to support a verdit.

The record reveals that Billy E. McGowan was temporarily employed by Texas Eastern Transmission Corporation for the purpose of performing general maintenance work for his employer at "Station G" near Kingsland, Arkansas. The mechanical facilities of "Station G" are completely encircled by a fence in the general shape of a rectangle.

The appellant, Arkansas Power and Light Company, owns and maintains a 110,000 volt electrical transmission line which leaves a three pole structure south of the above described enclosure, passes over the western side of the enclosure in a northerly direction to a three pole structure situated inside said enclosure where the transmission line terminates and from which termination point current is fed into a Texas Eastern electrical sub-station. The sole purpose of this transmission line is to serve "Station G."

Near the southwest corner of the enclosure there is situated a boilerhouse, belonging to Texas Eastern, which is about 18 by 40 feet in size, running parallel with and located east of the transmission line at a point about midway along the span of the line. A smokestack extends upward from the west side of the roof of the boil-

erhouse, the top of the stack being over 35 feet above the ground. The transmission line is 31 feet above the ground. Three guy wires support the smokestack, two of said guy wires being anchored in concrete to the ground, the anchors being in a line approximately parallel with and alongside the west side of the boilerhouse.

On June 8, 1955, Billy E. McGowan and three of his fellow employees were painting the smokestack on the boilerhouse. They painted the north side of the smokestack by placing an aluminum extension ladder, consisting of two 20 foot sections, which had been extended to the desired length against a point on the north side of the stack. Thereafter, McGowan and two of the employees who were situated on the ground, the fourth employee being on the roof of the building, discussed the manner in which to move the ladder to the west side of the building. They pulled the ladder away from the smokestack and boilerhouse without reducing its length; carried it around to the west side of the building, placed the foot of the ladder on the ground and proceeded to raise the ladder to lean it against the west side of the smokestack. One man held the ladder, two other men pushed the ladder up from the ground, and the fourth man, on the roof, pulled on a rope fastened to the ladder.

As the ladder reached or approached an upright position it came near enough to the transmission line to become charged with electricity so as to become a conductor, resulting in an electrical shock to Billy McGowan and his fellow employees. Billy McGowan died as a result of this electrical shock.

The appellee contends that the proximate cause of McGowan's death was due to the carelessness and negligence of the appellant as follows:

"1. By maintaining its 110,000 volt line with insufficient clearance with reference to said building and its attachments.

''2. By maintenance of its line at an unreasonable and dangerous distance from said building and its attachments, constituting an inexcusable hazard for workmen.

''3. By permitting said line to sag at a place unnecessarily close to said building and its attachments rendering the working conditions in, around, and about the building and its attachments unsafe and negligently exposing workmen to unnecessary and unreasonable risk by reason of the proximity of the line to said building and its attachments.

''4. By failure to use ordinary care by not complying with the standards generally recognized in the electrical industry to inspect and maintain its lines in a reasonably safe condition commensurate with the standards required for the safety of workmen and others.

''5. That the appellant failed and neglected to use ordinary care commensurate with the danger to be reasonably expected by maintaining and failing to move its lines a reasonable distance from the building and its attachments as required by the minimum standards and safety regulations governing the maintenance of electrical transmission lines in Arkansas.

''6. That the defendant was negligent by failure to place or cause to be placed near its high voltage transmission line where Billy McGowan was injured and killed a warning sign for the benefit of the deceased or other workmen of the nature and character of the **defendant's** line concerning its danger and proximity to the place where the deceased was required to work, and the failure to place such warning sign is contrary to standards usually required in the utility industry in connection with ordinary electrical construction where hazards may exist.''

Appellant answered with a general denial of the allegations contained in the complaint and set up a defense of contributory negligence on the part of decedent, Billy E. McGowan.

E. E. Blankenship, chief operator for Texas Eastern Transmission Corporation's "Station G," testified that he was supervising the work of Billy McGowan, Donald Hillman and A. C. Gibson on the date of the accident. He and the three employees were performing general maintenance work, which included the painting of the smokestack. The employees were using an aluminum extension ladder consisting of two 20 foot sections.

Blankenship further testified that he climbed this ladder and fastened it to the smokestack, in order to make it steady. The ladder had been extended approximately five or six feet. McGowan then ascended the ladder and spray painted the north side of the smokestack. After McGowan completed this portion of the operation, he descended to the ground so that he might help move the ladder to the west side of the building.

The ladder was lowered to the ground after the north side of the smokestack was painted and without reducing its extended length, the three employees carried the ladder to the west side of the building. Blankenship remained on the roof of the building so that he might help place the ladder against the west side of the smokestack. Three guy wires help support the smokestack. Two of these guy wires run from a point near the top of the stack to a point on the ground near the building. One of these two runs in a northwesternly direction and the other runs in a southernly direction.

Blankenship testified that McGowan and the other two employees, in moving the ladder from the north side of the building to the west side of the building, carried the ladder around outside of the northwestern guy wire, with the intention of "walking" the ladder up to a point on the west side of the smokestack. One of the men threw Blankenship a rope, which was attached to the ladder and he was steadying the ladder with the rope as they walked the ladder up. The ladder was in a straight line with the west side of the smokestack. When the ladder reached an undetermined height or position, there was a flash like a flash of lightning, which knocked the rope out of Blankenship's grasp and burned his hand.

Blankenship testified that he knew that appellant's electrical transmission line was situated near the building, but he did not know its height and did not realize that the ladder was near the line; that there was no sign on the building or guy wires warning of a high tension line and appellant corporation had never warned him or instructed him about the use of ladders around the lines.

Paul Zander, a consulting engineer, testified that the National Electrical Safety Code sets forth formulas and tables whereby determination can be made of required clearances of electrical wires from buildings, attachments and various objects; that the distances from the electrical transmission lines of appellant to the building and its attachments are in violation of the Code; that the least horizontal distance from the electrical transmission to a guy wire anchor of the smokestack was 7 feet, 3-3-4 inches; that this distance was 5 feet, 2-1-4 inches less than the minimum distance required by the Code; that the height of the electrical transmission lines was 31 feet above ground level and the height of the smokestack was 35 feet above ground level; that the span of the electrical transmission lines, between poles, was 393.33 feet.

There was introduced into evidence a plat and blueprint of the Texas Eastern Transmission "Station G." The plat and blueprint, which was prepared by Paul Zander, gave various measurements and distances of the transmission building, smokestack, guy wires and anchors, and electrical transmission wires.

D. B. Windsett, an electrical consulting engineer, testified that he visited the site of "Station G" and prepared blueprints and drawings showing various distances and measurements at the scene of the accident. When asked if these distances violated the National Electrical Safety Code, the witness stated:

"A. Based upon my interpretation of the Code and based upon the interpretation that these guy wires are a part of the building, these guy wires do fall within the distances or within the clearances which are specified by the Code and are less than those specified by the Code."

The following then transpired:

"Q. Would you explain to the jury in detail, citing sections of the Code, and pointing them out, explain how you arrived at that conclusion, step by step?

"A. In arriving at these clearances and also my interpretation of the Code it is based on the following sections of the National Electric Safety Code: Under Section 20, Rule 200, B, 'These rules are not complete specifications but are intended to embody the requirements which are most important from the standpoint of safety to employees and the public.' Rule 202, which are 'Minimum Requirements,' it states: 'The rules state the minimum requirements for spacings, clearances, and strength of construction. More ample spacings and clearances or greater strength of construction may be provided if other requirements are not neglected in so doing.' There is a footnote on that particular section, which reads: 'Some of these minimum values are exceeded in much existing construction; service requirements frequently call for stronger supports and higher factors of safety than the minimum requirements of these rules.' Section 211: 'Installation and Maintenance.' 'All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable.' Rule 214-A, 'Current-Carrying Parts. To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons.' Any basic clearance calculations are based on the following rules and tables: '234-C,' which is headed 'Clearances from Building.' '1. General. Conductors shall be arranged and maintained so as to hamper and endanger firemen as little as possible in the performance of their duties.' No. 4, 'Conductors Passing by or Over Buildings,' (a). Minimum Clearances. Unguarded or accessible supply conductors shall not come

closer to any building or its attachments (balconies, platforms, etc.) than listed below . . ."

The witness then explained step by step his method of determining the required horizontal clearance under the facts involved in this lawsuit and states such clearance to be 13 feet 8 inches.

That distance as set forth in the Code is the minimum requirement. When asked if it was considered good practice in the industry to post warning signs and if it is usually and generally accepted that warning signs should be posted, warning of high voltage overhead at a station like "Station G," the answer was:

"Either warnings or other safety guards." Such as "any type of fence that would keep them out of the direct line of contact with high voltage lines." I paid no particular attention to the fences around "Station G." In my opinion, those fences would not keep unauthorized persons on the ground away from high voltage lines. It was not similar to fences put around substations. I have observed the various and sundry signs and have put up some warning in the nature of warning signs. It is neither expensive nor impractical in placing the warning sign there. I would place it most anywhere around the vicinity of that particular line. It wouldn't make any difference as long as it was where it could be seen. The burn in the ladder introduced in evidence was caused in my opinion by direct contact with electricity. To make working conditions safe around that building I would make the recommendations to bring it up to minimum Code requirements. There are only two apparent things in my opinion that could be done to bring it in compliance. One would be to move the building and the other would be to move the line.

There was a stipulation by and between the parties "that the National Electrical Safety Code contains the guiding principles for overhead line construction practice, that Code having been prescribed for guiding principles for such practice by Rule and Regulation of the De-

partment of Public Utilities (now Public Service Commission) of Arkansas.''

Carroll H. Walsh, an electrical engineer employed by appellant testified that he had recently inspected the premises of ''Station G,'' that appellant corporation has to design its facilities to comply with the National Electric Safety Code and they must use the Code.

Carroll H. Walsh, C. E. Bathe and George D. Pollock, Jr., all electrical engineers and witnesses for appellant, testified that they had inspected the premises of ''Station G,'' that appellant corporation designs its facilities to comply with the provisions of the National Electric Safety Code; that based upon the blueprints prepared by engineer Paul Zander showing distances and measurements, and testimony adduced at the trial, the electrical transmission lines, as located, are in compliance with the Code. They further testified that the electrical industry does not make a practice of placing warning signs (of high voltage lines) on transmission lines such as the one located at ''Station G.'' It was their opinion that Section 234 (c) of the Code (Clearance from Buildings of Conductors) has reference to distance from buildings and not space from buildings. Bathe further testified that in his opinion the word ''attachments,'' as used in the Code, had reference to balconies, platforms or any structure that a man could stand upon.

The substance of appellant's contention is that the trial court should have found as a matter of law that appellant was not negligent; that deceased was guilty of contributory negligence and in either event, the court should have directed a verdict in its favor.

The above question has been before this court many times and under various circumstances. In the instant case the appellant was in sole control of its power line, which ordinarily carried an electrical charge of 110,000 volts. The only blueprints and plans, of measurements and distances between the transmission lines and the building and smokestack, were those that were introduced into evidence as prepared by Paul Zander.

The strict compliance or non-compliance with the abstract safety rules of the Code still leaves a factual question of negligence to be determined, under conditions shown to exist by the conflicting evidence in this case. There is no dispute that the guy wires on the west side of the building were anchored to the ground at a point slightly in excess of 7 feet, from a point on the ground directly beneath the transmission line. The evidence reveals that such attachment could be an obstruction to workmen performing maintenance work on the smokestack, particularly near the top of the smokestack which was four feet higher than the transmission line. The general provisions of the Code require electric companies to use a high degree of care and to so construct their facilities as to eliminate hazards to workmen and all other persons who may lawfully be near their power lines.

The evidence reveals that the employees of Texas Eastern deemed it necessary to carry the ladder on the outside of the anchored guy wires in order to raise it against the smokestack. The foreman, Blankenship, was situated on the roof of the building. He had hold of a rope that was attached to the ladder and was assisting his men in raising the ladder to the smokestack, when a flash occurred, resulting in an electrical charge and resulting death of Billy McGowan. Testimony reveals that the ladder either contacted the uninsulated transmission line or came near enough to it so as to cause the electricity to arc to the ladder.

In the case of *Futrell* v. *Arkansas-Missouri Power Corp.,* 104 Fed. 2d 752, the court said:

"(1)  It is elementary that in considering a motion to direct a verdict the testimony and all inferences that reasonably may be drawn therefrom must be accepted in the light most favorable to the plaintiff. *Adams* v. *Barron G. Collier, Inc.,* 8 Cir., 73 F. 2d 975.

"(2)  It likewise is elementary that an issue of negligence generally is a question for the jury and only where all reasonable minds must reach the same conclusion from

the facts does it become one of law for the Court and Justify the direction of a verdict. *Glynn* v. *Krippner,* 8 Cir., 60 F. 2d 406; *May Department Stores Company* v. *Bell,* 8 Cir., 61 F. 2d 830.

"(3) An electric company, because of the very nature of its business, is required to use a high degree of care in the erection, maintenance, operation and inspection of its plant and equipment used in the generation and transmission of electricity for the protection of those likely to come in contact therewith. *Dierks Lumber & Coal Company* v. *Brown,* 8 Cir., 19 F. 2d 732; *Arkansas Light & Power Company* v. *Cullen,* 167 Ark. 379, 268 S. W. 12; *Arkansas General Utilities Company* v. *Shipman,* 188 Ark. 580, 67 S. W. 2d 178."

In the case of *Arkansas Power and Light Co.* v. *Hoover,* 182 Ark. 1065, 34 S. W. 2d 464, this Court said:

"Moreover, this instruction was erroneous and should not have been given. We have repeatedly held that it was the duty of the company to keep its appliances in safe condition and that either the wires must be kept insulated, or must be so located as to be, comparatively speaking, harmless. If the company does not choose to properly insulate a deadly wire of its maintenance, it must place the same under ground, at a high altitude, or at some inaccessible place.

"We said in a recent case: 'The authorities appear to be unanimous in holding that there is no such duty, (to insulate all wires) but the cases do hold, as we understand them, that this duty must be performed, or other sufficient safety methods employed to prevent contact with wires conveying the current at such places as danger of contact may reasonably be anticipated.' *Ark. P. & L. Co.* v. *Cates,* 180 Ark. 1003, 24 S. W. 2d 846."

The facts in the case at bar are similar to the facts in the case of *Arkansas-Missouri Power Company* v. *Davis,* 222 Ark. 686, 262 S. W. 2d 916. In that case the electric wire, carrying 33,000 volts, had been installed by the power company in 1936. A sign-board was constructed nearby on private property in 1946. The sign-

board was situated approximately 4 feet from the power line. Davis received serious electrical burns when he lost control of an aluminum ladder which he was attempting to hook to the signboard and it came in contact with the electric wire. Two expert witnesses testified to the effect that in their opinion the clearance of the power line was insufficient to comply with the accepted standards of the engineering profession and the electrical industry. In that case this Court held,

"We think the testimony of Harvill and Zander was sufficient to take the case to the jury on the question of whether the defendant power company was negligent in permitting the electric line to remain within about 4 feet of the signboard after the construction of the board. The testimony of these two witnesses is one of the distinguishing features between this case and the case of *Arkansas Power & Light Co.* v. *Lum*, 222 Ark. 678, 262 S. W. 2d 920. It might be asked, how can it be said that the power company should have anticipated the very thing that did happen, but that the injured party be relieved from any duty to foresee what might happen even though he realized the dangerous qualities of electricity. The answer is that the questions of negligence and contributory negligence were peculiarly within the province of the jury to decide, there being sufficient evidence to justify the submission of both issues."

In the instant case, there were two expert witnesses who testified for the appellee and three expert witnesses who testified for the appellant. Their testimony is in sharp conflict as to whether the appellant exercised due care in the maintenance of its power line at the place where the accident occurred. The two expert witnesses for appellee testified that appellant's power line was not maintained in compliance with the standard code as adopted by the State and which is utilized by the electrical industry. The experts testifying for the appellant state that in their opinion the line does comply with the minimum standards of the Code. It is apparent that this conflict in testimony makes it a case

for the jury to determine from all the facts in the case whether the appellant was negligent.

The evidence also discloses that the deceased was a new hand, working under the supervision of a foreman and with older and more experienced workmen. In order to paint the smokestack, it was necessary to raise and place the ladder against the smokestack. The foreman, Blankenship, testified that he knew that the transmission line was there but did not realize the ladder was high enough to come close to the line; that he did not recall anyone from appellant corporation ever instructing them about the use of ladders around the transmission lines and that there were no signs on the building or guy wires, warning of a high tension line. Blankenship also testified that he did not warn his co-workers to be careful with the ladder around the transmission lines.

Witness Gibson testified that he was not conscious of any danger and that there was nothing to warn him of the proximity of the transmission lines to the building and smokestack. He also testified that the guy wires were anchored to a concrete foundation, which they had to get around with the ladder in order to paint the west side of the smokestack.

There is a complete lack of evidence to show that deceased had knowledge of any existing danger or knew of the close proximity of the transmission lines. Whether the deceased was using ordinary care for his own safety or whether he was guilty of contributory negligence, was a question for the jury to determine under the facts in the case. In *Arkansas-Missouri Power Company* v. *Davis, supra,* a case similar to the instant case, we held:

"In the circumstances we cannot say that Davis was doing something which an ordinarily prudent person would not have done; nor can we say that in the same or similar circumstances an ordinarily prudent person would not have lost control of the ladder.

" 'What will constitute contributory negligence on the part of the person injured must depend upon the circumstances of each case. If from those circumstances reasonable men might differ as to whether the person did or did not exercise ordinary care, the question must be left to the jury for its determination.' *St. Louis & S. F. Railroad Co.* v. *Carr,* 94 Ark. 246, 126 S. W. 850. See also *Capitol Transportation Co.* v. *Carter,* 204 Ark. 295, 161 S. W. 2d 746, and *Bush, Rec.,* v. *Jenkins,* 128 Ark. 630, 194 S. W. 704.''

In the case of *Coatney* v. *Southwest Tennessee Electric Membership Corp.,* Tenn. App., 292 S. W. 2d 420, the court held that it was a question for the jury to determine whether or not the plaintiff was guilty of contributory negligence in coming into contact with defendant's high voltage line, even though plaintiff had been warned of the presence of the line.

The appellant also contends that there was insufficient proof of pecuniary loss to sustain a verdict and judgment for $5,000. The evidence shows that decedent had worked during the school vacation period in 1955 and had contributed $590 to the family fund, which decedent and his parents utilized as needed. The decedent had always worked and in prior years had contributed a portion of his earnings to his parents. The amount of the judgment is approximately $100 per year to each of his parents over a period of their life expectancy. We find that the determination as to the allowance of this item was a question for the jury. The amount of the judgment is not excessive.

Affirmed.