CARROLL ELECTRIC COOPERATIVE CORPORATION
*v.* Lytle CARLTON, et al.

94-758                                              892 S.W.2d 496

Supreme Court of Arkansas
Opinion delivered February 20, 1995

556

*Friday, Eldredge & Clark*, by: *James C. Baker, Jr.*, and *Tony L. Wilcox.*

*Roy & Lambert*, by: *Brian D. Wood* and *Xollie Duncan*, for appellees Lytle and Novella Carlton.

*Jones & Jones*, by: *J. Scott Hardin* and *Lewis D. Jones*, for appellee Pamela McDaniel.

DAVID NEWBERN, Justice. Damages resulting from a fire in the home of the appellees, Mr. and Mrs. Lytle Carlton, were the subject of a claim brought against Pamela McDaniel, who is also an appellee, and Carroll Electric Cooperative Corporation (CECC), the appellant. Special verdict forms were submitted to the jury which found CECC liable but not Ms. McDaniel. Damages of $89,500.55, plus costs, were awarded against CECC which urges two points of appeal. First, CECC contends the Trial Court erred in giving an instruction on intervening cause, AMI 503. Second, it contends it is entitled to a new trial due to an inconsistency in the special verdicts returned by the jury. We affirm the judgment.

Mr. and Mrs. Carlton have cross-appealed. They contend the Trial Court erred by directing a verdict in favor of CECC on the issue of punitive damages and that it was error for the Trial Court to provide for interest on the judgment at 8% rather than the 10% required by statute. We hold the Trial Court did not err in directing a verdict on punitive damages. We reverse the decision to allow only 8% interest on the judgment, and we modify the judgment to provide interest at 10%.

At around 8:30 p.m., April 8, 1991, Ms. McDaniel lost control of her car due, according to her testimony, to oncoming headlights which "sort of blinded" her and her perception that the oncoming car was edging toward her lane. Her car left the road and struck a guy wire attached to a power pole owned by CECC and then struck another such pole. The guy wire on the first pole snapped, and the second pole was displaced some two inches at its base. A power outage occurred in the area at that time, apparently due to the tripping of a breaker in a CECC substation.

Shortly thereafter, a "troubleshooting" team, consisting of CECC employees Steve Embry and Terry Peters, was dispatched to the scene of the accident. They observed the poles and found no damage to them. Mr. Embry testified that the guy wire had, upon being broken, flipped up over the feeder line, and that caused the power outage.

After inspecting the poles with flashlights, Mr. Embry and Mr. Peters decided not to replace the guy wire and that it was safe to restore the power to the line served by the pole to which the guy wire had been attached. Some of the details of what happened next are unclear, but it is undisputed that a wire supported by that pole came down at some point and energized a nearby fence. The fence ran close to an LP gas tank outside the Carlton home which was about an eighth of a mile away from the accident scene. Power arced from the fence to the tank and ran from the tank up a pipe to a clothes dryer in the Carlton home. The fire was determined to have begun sometime later at the clothes dryer.

On the morning of April 9, Messrs. Embry and Peters reported the accident and broken guy wire to their supervisor Jim Tevebaugh. Mr. Tevebaugh testified he did not have time to go to the scene until around noon, about which time he heard on

radio about a house fire which was occurring. When he arrived he found a broken feeder wire which had touched the fence and burned so it was hanging about six inches above the fence.

Mr. Tevebaugh and his crew replaced the broken feeder wire and then went on down the line to the scene of the accident where they replaced the broken guy wire. Mr. Tevebaugh and experts who also testified explained that in a single phase electrical line, such as the one being discussed, the feeder wire is strung some four feet higher than a neutral wire strung below it on the same poles.

Electrical engineer John G. St. Clair, an expert witness presented by the Carltons, testified that when the car hit the guy wire it pulled the guy wire back and then, when the guy wire broke, the pole was snapped forward. That caused the feeder wire to sag, and to sag further during the night, eventually causing the feeder wire to touch the neutral wire which did not sag as much because it caught on the branches of a tree. He said when the two wires touched it caused "fireworks." It was his opinion that the guy wire should have been replaced and the remainder of the wire inspected that night prior to restoring power to the line. He concluded CECC had been careless and acted in disregard for human life by restoring power to the line and failing to take those precautions.

Another electrical engineer, Eric Jackson, presented by CECC, testified that the collision with the guy wire caused a "galloping" in the wires which allowed the feeder wire to touch the neutral wire. That would have caused no breakage at that time but could have merely weakened the core of the feeder wire, and that would not have been apparent to one inspecting it shortly after the accident. The wire could then have broken due to wind or some other physical force in the 13 or 14 hours between the time of the accident and the fire. He disputed the "sag theory" espoused by Mr. St. Clair.

Over the objection of CECC, an instruction based on AMI 503 was given to the jury as follows:

Now, in this case Pamela Jean McDaniel contends and has the burden of proving that following any act or omission on her part an event intervened which in itself caused

damage completely independent of her conduct. If you so find, then her act or omission was not a proximate cause of any damage resulting from the intervening event.

The jury was given these special verdict forms:

Do you find from a preponderance of the evidence that there was negligence on the part of Carroll Electric Cooperative Corporation which was a proximate cause of any damages?

Do you find from a preponderance of the evidence that there was negligence on the part of Pamela Jean McDaniel which was a proximate cause of any damages?

If you have answered either Interrogatory No. 1 or Interrogatory No. 2 "yes," then answer this interrogatory: Using 100% to represent the total responsibility for the occurrence and any injuries and damages resulting from it, apportion the responsibility between the parties whom you have found to be responsible:

A final form asked the jury to assess the amount of damages shown by the preponderance of the evidence to have been suffered by the Carltons.

Nine jurors signed each of the first two forms as well as the fourth. The first one was answered "yes." The second one was answered "no." The third form, inquiring about the percentage of liability assigned to Ms. McDaniel and to CECC, was answered "100%" to CECC and "0%" to Ms. McDaniel. It was signed only by the jury foreman. When the Trial Court inquired whether that verdict was unanimous, a juror answered that it was not. The foreman then commented that he thought it unnecessary have the jurors sign that form in view of their responses to the first two forms. The jury was then returned to the jury room so that the third form could be signed by the jurors who agreed to it. It was returned with nine signatures. One of the signatures on the third form was that of Melissa Habermehl. Ms. Habermehl was not one of the nine who had signed the first form. She was thus on record as finding CECC 100% at fault but not as having found CECC negligent and the proximate cause of the damages.

### 1. Intervening cause

The question presented is whether the evidence justified giving an instruction which allowed the jury to consider whether the negligence it ultimately found on the part of CECC was, in the words of AMI 503, an "event [which] intervened which in itself caused damage completely independent of [Ms. McDaniel's] conduct," thus exonerating Ms. McDaniel of any liability.

■ Section 452 of the Restatement (Second) of Torts (1965), to which we referred in *Kelly* v. *Wiggens*, 291 Ark. 280, 724 S.W.2d 443 (1987), is cited by CECC. It discusses intervening or, as the Restatement perhaps more appropriately calls it, "superseding" cause. It provides in subsection (1) that as a general rule the failure of a third party to prevent harm threatened by another's conduct is not a superseding cause. In subsection (2), however, it provides:

> Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

■ The Restatement provision and underlying commentaries are not very helpful here as they deal in the question of "duty" and whether it may be shifted entirely from one negligent actor to another. The matter of whether one party or another or more than one has a duty is a question of law for the Trial Court to decide. *Lawhon Farm Supply, Inc.* v. *Hayes*, 316 Ark. 69, 870 S.W.2d 729 (1994); *Keck* v. *American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983).

■ An electric company is held to a high degree of care in the erection, maintenance, operation, and inspection of its equipment used in the generation and transmission of electricity. *Arkansas Power & Light Co.* v. *McGowan*, 227 Ark. 55, 296 S.W.2d 420 (1956). *See also Woodruff Electric Coop. Corp.* v. *Daniel*, 251 Ark. 468, 427 S.W.2d 919 (1971). No doubt CECC owed a duty of care to the public, including the Carltons.

In this case, the Trial Court made no decision holding that whatever duty Ms. McDaniel may have had shifted over to CECC. Rather, the question of intervening cause was submitted to the jury

on the basis of AMI 503 which requires the jury to determine whether the circumstances were such that the damages to the Carltons were caused by an event which was completely independent of Ms. McDaniel's actions. The issue submitted to the jury was thus one of causation, not one of duty.

In *Larson Machine, Inc. v. Wallace*, 268 Ark. 192, 600 S.W.2d 1 (1980), we discussed thoroughly the concept of "efficient intervening cause." One of the defendants was the supplier of an agricultural spreading machine. The machine operated from the power take-off of a tractor. The shaft of the machine had no protective cover. The supplier contended it could not be held responsible for injury suffered to the farmer who allowed his pants to be caught in the turning shaft because the farmer's negligence in stepping near the shaft was such an intervening cause. We noted that the question of intervening cause, like any other question of proximate causation, is usually one for the jury, and it was not error to have submitted it to the jury in that case.

In *Arkansas Kraft Corp. v. Johnson*, 257 Ark. 629, 519 S.W.2d 74 (1975), a lumber company was held liable for negligently loading a railroad car with timber. The timber fell out killing a bystander. The lumber company contended it could not be liable as a matter of law because the acceptance of the obviously negligently loaded car by the railroad for transport was a superseding cause. Although the question presented was not whether it was proper to have instructed the jury on intervening cause, we remarked, "An instruction on intervening cause was properly given to the jury, and certainly we cannot say, as a matter of law, that there was no jury question on this issue."

We understand and are sympathetic to CECC's insistence that the fire in this case would not have happened had the guy wire not been severed by Ms. McDaniel. We are, however, persuaded that the evidence allowed the jury to find that the public, including the Carltons, was out of danger when the electricity went off immediately after the accident. The fire occurred some 14 or 15 hours later. It could have found that no further injury would have occurred had the power not been restored to the line without reattaching the guy wire, and thus that the negligence of CECC was an independent, intervening efficient cause of the damages.

## 2. *Inconsistent special verdicts*

Arkansas R. Civ. P. 48 and Ark. Const. art. 2, § 7, require that an other than unanimous verdict be signed by at least nine jurors. The problem here is that the special verdict finding CECC liable was not signed by Ms. Habermehl but the special verdict finding 100% liability on the part of CECC was signed by her. CECC contends this inconsistency entitles it to a new trial.

True enough, Ark. R. Civ. P. 48 provides that all jurors consenting to a verdict which is less than unanimous "shall sign the same." *See Center* v. *Johnson*, 295 Ark. 522, 705 S.W.2d 396 (1988) (Glaze, J., concurring). It is thus apparent that if Ms. Habermehl indeed thought CECC was liable for 100% of the damages sustained by the Carltons as her signature on the third special verdict form indicated, Rule 48 may have been violated by her failure to sign the first special verdict form.

We have some doubt whether CECC has demonstrated any prejudice as a result of the juror having signed the one special verdict but not the other, but we conclude that it waived the right to have the matter considered on appeal by its failure to object at the trial. Ordinarily a party has an obligation to make such an objection before the jury is discharged or the error, if any, is waived. *Wal-Mart Stores, Inc.* v. *Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991); *P.A.M. Transport, Inc.*, v. *Arkansas Blue Cross & Blue Shield*, 315 Ark. 234, 868 S.W.2d 33 (1993). The reason for the rule is that an objection at that time allows the Trial Court to resubmit the inconsistent verdict to the jury and attempt to correct the discrepancy.

*Center* v. *Johnson, supra*, is a plurality decision cited by CECC in support of its contention that its failure to question the special verdicts before discharge of the jury did not result in waiver of an issue concerning the verdicts on appeal. In that case, the Trial Court and the jury foreman announced that the verdict had been signed by nine jurors. When the verdict was inspected after the trial, it was discovered that only eight jurors had actually signed. We held that the objection was not waived because the parties had been misled by the announcement and thus had no reason to object.

■ This case is different. No one was misled by any announcement by the Trial Court. In fact, nine jurors had signed each of the special verdict forms. Not only was neither party misled, both were alerted to some confusion in the process of dealing with the special verdict procedure when it became necessary to return the jury for signatures on the third form. The problem could have been identified prior to the discharge of the jury had the parties simply examined the special verdict forms after they were returned and before the jury was discharged. We hold CECC's objection on the basis of inconsistency of the special verdicts was waived.

### 3. Punitive damages

■ On the cross-appeal, we cannot say the directed verdict in favor of CECC on the Carltons' claim for punitive damages was error. If any substantial evidence existed tending to establish an issue of fact on the issue, it was error for the trial court to take the case from the jury. *Ikani* v. *Bennett*, 284 Ark. 409, 682 S.W.2d 747 (1985).

■ An award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. *National By-Products, Inc.* v. *Searcy House Moving Co., Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987). There was no evidence tending to prove that CECC acted with actual malice. Nor was there evidence of conscious indifference to the consequences of its actions. The jury was justified in finding negligence in direct connection with the incident and perhaps in the general lack of any inspection program more rigorous than casually viewing the lines as CECC workers drove past. That, however, does not satisfy the criteria for punitive damages. Mere negligence, or even gross negligence, is not sufficient to justify punitive damages. *Missouri Pac. RR* v. *Mackey*, 297 Ark. 137, 760 S.W.2d 59 (1988); *National By-Products, Inc.* v. *Search House Moving Co., Inc.*, 292 Ark. at 494.

### 4. Interest

■ The Carltons correctly contend in their second cross-appeal point that it was error for the Trial Court to award interest at 8% per annum on the judgment. Apparently, the judge

crossed out the portion of the judgment form that provided that the amount of recovery of the plaintiffs shall bear interest at 10% per annum, and wrote above it the rate of 8%.

Arkansas Code Ann. § 16-65-114 (1987) provides as follows:

(a) Interest on any judgment entered by any court or magistrate on any contract shall bear interest at the rate provided by the contract or ten percent (10%) per annum, whichever is greater, and on any other judgment at ten percent (10%) per annum, but not more than the maximum rate permitted by the Arkansas Constitution, Article 19, Section 13, as amended.

CECC argues that the clear language of the statute indicates that the interest on any judgment is limited by the maximum rate allowable by the Constitution, and for that reason the Trial Court was correct when it assigned an interest rate of 8% per annum.

Article 19, section 13, of the Constitution does not apply to interest on judgments. *McElroy* v. *Grisham*, 306 Ark. 4, 810 S.W.2d 933 (1991). Interest should have been provided at the statutory rate. We therefore reverse only that portion of the judgment providing for 8% interest per annum on the judgment, and we modify it to provide that interest on the judgment shall be 10% per annum.

The judgment is affirmed on appeal and affirmed in part and reversed and modified in part on cross-appeal.