2011 Ark. App. 639

**Sidney J. PHILLIPPY & Tina Dickey, Appellants**

v.

**ANB FINANCIAL SERVICES, LLC; Insurance Marketplace; and GL Holdings, LLC, Appellees.**

**No. CA 10–378.**

Court of Appeals of Arkansas.

Oct. 26, 2011.

Kenneth Robert Shemin, Fayetteville, Timothy James Cullen, Andrew Mikeal Taylor, Tasha C. Taylor, Little Rock, for appellant.

Derrick Mark Davidson, Fayetteville, for appellee.

RAYMOND R. ABRAMSON, Judge.

Sidney Phillippy brings this interlocutory appeal from an order of the Benton County Circuit Court refusing to compel arbitration of breach-of-contract claims that appellees ANB Financial Services, LLC, a/k/a Insurance Marketplace (appellants' former employer), and GL Holdings, LLC, filed against him. He and appellant Tina Dickey also argue that the circuit court erred in refusing to dissolve a temporary restraining order prohibiting them from contacting IM's former clients. GL Holdings has cross-appealed from the entry of directed verdict on several claims concerning bid-rigging in GL's purchase of IM. We affirm on the direct appeal and reverse and remand on the cross-appeal.

Phillippy was an insurance agent for many years. He owned an insurance agency, later known as Insurance Marketplace (IM), that he sold to Arkansas National Bank (ANB) in 2002. Dickey was also a licensed agent who worked with Phillippy for almost two decades. The Federal Deposit Insurance Corporation (FDIC) took over ANB in 2008 and solicited bids for the sale of IM. The bidders for IM included GL Holdings and Steve Standridge. Phillippy wanted Standridge to win the bid; after it became apparent that he was not likely to do so, appellants accepted offers to work for him. While

still at IM, appellants exchanged emails about their letting a bidder (not GL) know that they were leaving. Phillippy sent an email to a friend stating that he intended to "pirate as many accounts" as he could if he left to work for another agency. GL ultimately won the bid. Appellants continued to work for IM for about a week after that. Because of Phillippy, some of IM's clients renewed their policies through Standridge's agency.

On June 27, 2008, appellees filed a complaint alleging that appellants had wrongly enlisted their customers and misappropriated IM's trade secrets, including its customer list and customer information. They brought claims for breach of contract; interference with contractual relations and business expectancy; theft of trade secrets [1]; conversion; violation of the Deceptive Trade Practices Act; and conspiracy, and asked for injunctive relief and damages. When Phillippy sold the agency to ANB, the parties entered into three agreements. They entered into an Agreement Plan of Merger, which covered the sale of the agency. It included a covenant-not-to-compete, wherein Phillippy agreed that, for three years from the later of the transaction's closing date, the termination of Phillippy's relationship with ANB under the Employment Agreement, or "any successor agreement," Phillippy would not engage in any business in competition within a sixty-mile radius of Bentonville. He also agreed, for the same time period, not to disclose the identity of, or information about, customers or to directly or indirectly solicit other employees of ANB to terminate their employment or disrupt ANB's relationship with customers. The parties entered into a separate Covenant Not to Compete Agreement, which contained the same terms.

They also entered into an Employment Agreement, which provided that Phillippy would be an employee of ANB for a period of two years. The Employment Agreement contained a survival clause expressly agreeing that the terms and provisions set forth in sections 6, 7, and 9 of that agreement "shall survive the termination of this Agreement and shall be and remain valid, binding and enforceable upon all parties after such termination." Section 6 provided in part: "In the event of . . . the termination of this Agreement, so long as Phillippy does not Engage in Competition with ANB (as hereinafter defined) for a period of three (3) years from the date of such termination, ANB shall purchase from Phillippy or his heirs, as applicable, the Equitable Value" of the new insurance accounts sold and serviced by Phillippy, unless Phillippy were terminated for cause. Section 6.1 added:

As used in this Section 6, the term "Engage in Competition with ANB" means that Phillippy shall not directly or indirectly own, manage, operate, join, control, or participate in the ownership, management, operation, or control of, or be connected in any manner with, or assist others with any business which engages in competition with ANB within a sixty (60) mile radius of Bentonville, Arkansas.

Section 7 defined ANB's "property" as follows:

Except as provided in Section 6 of this Agreement, Phillippy agrees that all insurance business placed upon the books of ANB and all Confidential Customer Information (as defined herein) obtained by or through Phillippy's efforts, either directly or indirectly, and whether handled by ANB or Phillippy, shall be and remain the sole and exclusive property and assets of ANB. Except as provided in Section 6 of this Agreement, Phillippy shall have no right

---

1. Ark.Code Ann. §§ 4–75–601 through 607 (Repl.2001).

to or interest in any such insurance business or Confidential Customer Information, or in the renewals of such business, or in any expiration information, records, contracts, or documents ("Business Information") whether produced by Phillippy or ANB or any other producers of ANB. Phillippy agrees and acknowledges that the disclosure, removal or transfer of the Business Information or Confidential Customer Information would give an unfair business advantage to Phillippy and/or competitors of ANB and be grounds for immediate termination of Phillippy.

For purposes of this Agreement, "Confidential Customer Information" shall mean all nonpublic personally identifiable risk and financial information:

(a) a customer provides to Phillippy to obtain an insurance product or service;

(b) about a customer resulting from a transaction involving an insurance product or service; or

(c) Phillippy otherwise obtains about a customer in connection with providing an insurance product or service for that customer.

The Employment Agreement also contained an arbitration clause agreeing to arbitrate any dispute "arising out of or relating to this Agreement." In August 2008, Phillippy filed a motion to compel arbitration of the contract claims. Appellees argued that the arbitration clause did not apply, because they had brought no claims under the Employment Agreement. They also asserted that, while continuing to work at IM on an at-will basis after the Employment Agreement expired, Phillippy did so under an unwritten "successor agreement," as contemplated in the Agreement Plan of Merger, thereby keeping the noncompete agreements in effect until three years from Phillippy's last day of work at IM. Appellants, however, have contended that there was no successor agreement.

The trial court entered an ex parte temporary restraining order (TRO), which it extended after a hearing. Phillippy moved to dissolve the TRO in October 2008. The court held a hearing on that motion in December 2008. In February 2009, the trial court entered an order denying the motion to dissolve the TRO. In that order, the court found that the numerous measures that IM took to protect its customer list and information were sufficient to guard their secrecy. The court also found that there was a substantial likelihood that IM would prevail on the merits of its case at trial (that its customer names and information were trade secrets) and that IM's business would suffer irreparable harm if the TRO did not remain in effect.

Appellees filed a second amended complaint adding claims for wrongful disruption of honest competition in the bidding process for the sale of IM. On the basis of the arbitration clause, Phillippy filed a motion in limine as to all contract-related claims in July 2009. Trial began in August 2009 before a jury and proceeded for several days. At the conclusion of appellees' case-in-chief, Phillippy moved again to compel arbitration of the contract claims, which the trial court denied, noting its inclination to agree with appellees' position that the Employment Agreement's arbitration provision did not apply to the noncompetition agreements. The trial court granted appellants' motion for directed verdict on appellees' bid-rigging claims. Appellants renewed their motion to dissolve the TRO, which the trial court denied. Phillippy stated that he wished to pursue his right to an immediate appeal of the denial of his motion to compel arbitration. Upon the parties' agreement, the trial court continued the trial. On August 10, 2009, the circuit court entered an order

stating that appellees' claims for interference with contractual relations, conversion, deceptive trade practices, and conspiracy were dismissed without prejudice, and that the bid-rigging claims were dismissed in accordance with appellants' motion for directed verdict.

On September 10, 2009, the trial court entered an order denying appellants' motion to compel arbitration; granting appellees' motion to continue the trial of other claims; denying appellants' motion to dissolve the temporary restraining order; and granting appellants' motion for directed verdict on appellees' claims related to bid-rigging because the evidence of damages was too speculative. The court also entered a certificate under Arkansas Rule of Civil Procedure 54(b) to facilitate an interlocutory appeal of the directed verdict on the bid-rigging claims and the denial of the motion to dissolve the TRO.[2] Appellants then pursued this appeal, and appellees filed a cross-appeal.

■■■ Appellants argue that the circuit court erred in refusing to dissolve the TRO. They do not dispute that appellees met their burden of proving irreparable harm, but contend that they [7]failed to demonstrate a likelihood of success on the merits because appellees took no measures to protect their purported trade secrets after employment terminated. They also contend that appellants' knowledge of the names of the clients with whom they previously worked is not protected by the Arkansas Trade Secrets Act. We need not decide this issue, however, because the time limit for the TRO has elapsed, making the issue moot. *Se. Ark. Landfill, Inc. v. State*, 313 Ark. 669, 858 S.W.2d 665 (1993). The TRO against Dickey expired on December 31, 2009. The TRO against

Phillippy expired on December 31, 2010. Any decision by this court would have no practical legal effect upon an existing legal controversy. *Gee v. Harris*, 94 Ark.App. 32, 223 S.W.3d 88 (2006). We do not decide moot or academic issues. *Villines v. N. Ark. Reg'l Med. Ctr.*, 2011 Ark. App. 506, 385 S.W.3d 360.

Appellants argue in their second point that the trial court erred in refusing to compel arbitration with respect to the breach-of-contract claims. They acknowledge that the Arkansas Uniform Arbitration Act expressly excludes employer-employee disputes. Ark.Code Ann. § 16–108–230 (Supp.2011). They contend that the Federal Arbitration Act (FAA) applies to this case because IM was engaged in interstate commerce, which Phillippy facilitated by writing policies from insurance underwriters all over the United States. Phillippy argues that the Employment Agreement has expired and that there was no successor agreement to continue the noncompetition agreements; however, if appellees insist on relying on the Employment Agreement for their breach-of-contract claims, he contends that he is entitled to rely on the protection offered by the arbitration provision in that agreement.

■■■ [8]An order denying a motion to compel arbitration is an immediately appealable order. *Centennial Bank v. Tribuilt Constr. Group, LLC*, 2011 Ark. 245, 388 S.W.3d 897; *CEI Eng'g Assocs. v. Elder Constr. Co.*, 2009 Ark. App. 259, 306 S.W.3d 447; Ark. R.App. P.-Civ. 2(a)(12) (2011). We review a circuit court's order denying a motion to compel arbitration de novo on the record. *Advocat, Inc. v. Heide*, 2010 Ark. App. 825, 378 S.W.3d 779. In a de novo review, we analyze the evi-

2. The denial of the motion for arbitration was immediately appealable. Ark. R.App. P.-Civ. 2(a)(12) (2011). The denial of appellants' motion to dissolve the TRO was also immediately appealable. Ark. R.App. P.-Civ. 2(a)(6) (2011). The Rule 54(b) certificate, therefore, was only necessary to bring an interlocutory appeal of the entry of the directed verdict.

dence and the law without giving deference to the trial court's rulings. *CEI Eng'g Assocs., supra.* When the underlying dispute involves interstate commerce, the FAA applies. *Ruth R. Remmel Revocable Trust v. Regions Fin. Corp.*, 369 Ark. 392, 255 S.W.3d 453 (2007). State courts have concurrent jurisdiction with the federal courts to enforce rights granted by the FAA. *Lehman Props., Ltd. P'ship v. BB & B Constr. Co.*, 81 Ark.App. 104, 98 S.W.3d 470 (2003). There is a strong national policy favoring the enforcement of arbitration agreements. *Terminix Int'l Co. v. Trivitt*, 104 Ark.App. 122, 289 S.W.3d 485 (2008). Arbitration is a matter of contract between parties. *Id.* In deciding whether a party has entered into an agreement to arbitrate under the FAA, courts are to apply general state law principles, giving due regard to the federal policy favoring arbitration. *Id.* The threshold question is whether there is a valid arbitration provision, which is a question of state law. *Gruma Corp. v. Morrison*, 2010 Ark. 151, 362 S.W.3d 898. The same rules of construction and interpretation apply to arbitration agreements as apply to contracts generally. *Id.*

The only arbitration clause was found in the Employment Agreement, which, as the parties stipulated, expired over three years before Phillippy left IM. Appellees make no claim based on the Employment Agreement; they base their breach-of-contract claims only on the Merger Agreement and the Covenant Not to Compete Agreement, which unambiguously did not provide for arbitration. Accordingly, we find no contractual basis for arbitration and affirm on this issue.

On cross-appeal, GL argues that the trial court erred in directing a verdict on the bid-rigging claims. A directed-verdict motion is a challenge to the sufficiency of the evidence, and when reviewing the denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *See Superior Fed. Bank v. Mackey*, 84 Ark.App. 1, 129 S.W.3d 324 (2003). Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* When determining the sufficiency of the evidence, the appellate court reviews the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

Although the order indicated that the trial court granted the directed verdict on the ground that GL's evidence of damages was too speculative, the trial court indicated from the bench that it was also doing so on the basis of proximate cause. Proximate cause is that which, in a natural and continuous sequence, produces damage. *Villines, supra.* Proximate cause is generally a question of fact, *id.*, unless the evidence is such that reasonable minds cannot differ. *J.E. Merit Constructors, Inc. v. Cooper*, 345 Ark. 136, 44 S.W.3d 336 (2001). GL contends that the trial court erred in ruling that, to prove causation, it had to produce evidence that one of the persons appellants told about their plan would have bid more for the business than GL. We agree; this approach would have applied to the FDIC, if it had been a plaintiff, but not GL. GL further argues that its evidence on the element of proximate cause was sufficient to avoid a directed verdict because it demonstrated that, if GL had known that appellants were telling some prospective bidders, but not GL, about their plan to leave IM and pirate its customer accounts after the sale, GL would not have bid on or purchased the business, which lost fifty percent of its expected revenue in the first

year after the sale. GL points out that Phillippy stated in an e-mail that "[i]t would be a shame if he [a competing bidder] thought we were going to stay" and that appellants decided to tell the competing bidder so "he will know what is in front of him." Thus, GL argues, the playing field in the bidding process was not level, and it bought an agency that immediately lost half of its value because of appellants' actions. Gene Long, GL's owner, testified that GL would not have bid at all on IM if it had known that appellants had improperly influenced the bidding process.

GL also asserts that it produced sufficient evidence of damages to get to the jury. While our courts have said that damages must not be left to speculation and conjecture, *Dawson v. Temps Plus, Inc.,* 337 Ark. 247, 987 S.W.2d 722 (1999), it has also been held that damages may be approximated, *Morton v. Park View Apartments,* 315 Ark. 400, 868 S.W.2d 448 (1993); that a damage figure will be upheld if an amount approximating that figure can be ascertained from the evidence, *see Taylor v. Green Memorial Baptist Church,* 5 Ark.App. 101, 633 S.W.2d 48 (1982); and that a damage award need not correspond in amount to the proof adduced by either party. *Dickson v. Delhi Seed Co.,* 26 Ark.App. 83, 760 S.W.2d 382 (1988). When, from the nature of the case, the amount of damages cannot be estimated with certainty, or only a part of them can be estimated, the question should go to the jury. *Agracat v. AFS–NWA, LLC,* 2010 Ark. App. 458, 379 S.W.3d 64.

Gene Long testified that he had calculated his bid by projecting the annual revenue that IM was reasonably expected to generate; he adjusted his bid from the projected revenue of $750,000 to $540,000, to account for the expected loss of customers that customarily occurs with purchases of insurance agencies. He testified that

IM actually lost fifty percent of its revenue during the first year after the sale, which was an "unheard of" rate of attrition, based on his experience with buying insurance agencies. Thus, he calculated GL's damages at $270,000—fifty percent of the purchase price.

We hold that GL presented sufficient evidence of proximate cause and damages to go to the jury. The trial court, therefore, erred in directing a verdict on these claims.

Affirmed on direct appeal; reversed and remanded on cross-appeal.

GLOVER and MARTIN, JJ., agree.